# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS PAUL WEST,
            *Petitioner-Appellant,*

            v.

CHARLES L. RYAN, Director of
Arizona Department of
Corrections,
            *Respondent-Appellee.*

No. 08-99000

D.C. No.
CV-98-00218-DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
February 4, 2010—Pasadena, California

Filed June 10, 2010

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

8509

## COUNSEL

The Federal Public Defender of Arizona, Assistant Federal Public Defenders Timothy M. Gabrielsen of Tucson, Arizona, and Paula Kay Harms of Phoenix, Arizona, for the petitioner.

Office of the Arizona Attorney General, Deputy State Attorney General, Jonathan Bass of Tucson, Arizona, for the respondent.

## OPINION

CALLAHAN, Circuit Judge:

Thomas Paul West ("West") appeals the district court's denial, without an evidentiary hearing, of his claim of ineffective assistance of sentencing counsel. We conclude that the district court did not abuse its discretion in denying his claim without a hearing and therefore affirm the judgment of the district court.

## I.  Background

### A.  Murder and Trial

West moved to Arizona from Illinois in June 1987. While living in Tucson with a family friend, he met Donald Bortle ("Bortle"). Bortle had various items for sale in his home, including assorted electronic equipment and videotapes of popular movies. West's friend wanted to buy some things from Bortle, and West accompanied her to his house. About two weeks later in mid-July 1987, West broke into Bortle's home, beat him severely about the head, and bound his limbs. He left Bortle to die, stealing his car and various other items, including several pieces of electronic equipment.

West transported the stolen goods to the desert where he hid them, and then drove to Glendale where some of his friends lived. After retrieving the goods from Tucson with an acquaintance, West returned to Glendale and spent a couple of days with his friends.[1] He made several allusions to beating up and robbing "some guy," but expressed no remorse about

---

[1]The record shows that West was buying and taking large amounts of drugs around the time of the murder and immediately thereafter. Defense counsel successfully excluded this evidence from trial but introduced it during sentencing to establish the extent and effects of West's substance abuse.

it. West then absconded to Illinois with much of the stolen property. Soon thereafter, one of West's acquaintances contacted the Pima County Sheriff's Office, and an investigation led officers to Bortle's home where they discovered his dead and decaying body. His hands and feet were bound with a vacuum cleaner cord and lamp wire, and he had extensive fractures on the right side of his face. The fractures were so severe that his hard pallet had detached from his skull. The coroner estimated that he had bled to death within forty-five minutes to an hour after the beating.

West was arrested in Illinois when the car in which he was riding was stopped for speeding, and the officer discovered he was wanted for murder in Arizona. A search of the car revealed several pieces of electronic equipment and other items stolen from Bortle's home.

West was charged in Arizona state court with first degree murder, second degree burglary, and theft. On July 27, 1987, the court appointed two public defenders, Frank Dawley ("Dawley") and Maddalena Fiorillo ("Fiorillo"), to represent him. Soon after their appointment, they arranged for two neuropsychologists, Dr. Overbeck and Dr. Allender, to evaluate West for possible brain damage from substance abuse and purported head injuries. Dr. Overbeck's report, if one was ever made, does not appear in the record. As discussed in more detail below, Dr. Allender evaluated West over a two-day period and concluded that the test results were "more consistent with an individual of low educational status who may have some evidence of a learning disability" than with a cognitive impairment.

It appears that no question was raised about West's competency to stand trial, and following a week-long jury trial at which West did not testify, the jury returned guilty verdicts on all three counts.

## B.   Sentencing

The prosecution sought the death penalty, citing the following aggravating factors: (1) the murder was committed for pecuniary gain; (2) the murder was committed in an especially cruel and heinous manner; and (3) West had a prior conviction for a crime of violence (a 1981 manslaughter conviction).[2]

At the initial sentencing hearing on May 4, 1988, West's counsel argued that a conviction for felony murder precluded imposition of the death penalty. Dawley indicated that, as "a matter of strategy," he and Fiorillo chose to rely solely on this "legal argument" and not to present mitigation witnesses. Dawley said that they had looked for mitigating factors, explaining that West had been "examined" from "a mental health standpoint," but that he and Fiorillo had determined that the evidence "was not worth bringing" to the court.

The judge disagreed with the defense's legal theory that the death penalty could not be imposed for a felony murder conviction and asked West if there was anything he wished to say prior to sentencing. West indicated that there were a lot of people who would testify that he was not a "wicked mad man," but that he did not feel like "dragging them in" because he felt the court had already made up its mind. The court responded that it would consider any such evidence and would delay sentencing so that West could present it. West agreed, and the court rescheduled the hearing for June 6.

On May 11, Dawley sought and obtained another continuance, delaying the sentencing hearing until August 1. During the interim, defense counsel sent two investigators to Illinois and Oklahoma to interview thirteen witnesses about West's childhood, drug addiction, and the circumstances surrounding

---

[2]The record contains conflicting information as to whether the conviction was for voluntary or involuntary manslaughter.

the earlier 1981 homicide. Counsel also retained a substance abuse expert, Terry Hickey ("Hickey"), who interviewed West, West's mother, his brother, and LuAnn St. Aubin (West's girlfriend at the time of the 1981 homicide). Hickey reviewed the transcripts of the interviews with West's family and friends, as well as West's Illinois prison records, his medical records, and Dr. Allender's neuropsychological evaluation.

Meanwhile, the probation office submitted an amended presentence report ("PSR"), which described positive letters from West's father, grandmother, maternal aunt, and a family friend. The letter from West's father stated that West was well-liked and that drugs and alcohol were "the bottom line to all of [his] problems." Other letters opined that West needed drug treatment and that he was a good person when he was not using drugs. The PSR took note of the numerous interviews conducted by the defense investigators and advised the court to consider that West's actions may have been the result of chronic and acute drug abuse, which may have reduced his ability to appreciate the wrongfulness of his actions. It also opined that West's actions may have resulted from an unstable and abusive home environment.

In its pre-hearing sentencing brief, the defense argued that West (1) had an emotionally deprived childhood, (2) suffered from substance abuse, which diminished his capacity to conform his conduct to social and legal norms, (3) could be rehabilitated, (4) did not intend to kill Bortle, (5) could not legally be put to death for felony murder, and (6) had acted in self-defense and defense of another in connection with his 1981 homicide conviction.

At the August 1 sentencing hearing, Hickey and five lay witnesses testified on West's behalf. The defense also submitted newspaper articles about the 1981 homicide, hospital records from West's drug-related hospitalizations in 1983 and 1986, a rap sheet from the Department of Justice, and tran-

scripts of interviews with thirteen witnesses who discussed the extent of West's substance abuse, his emotionally deprived childhood, and/or the circumstances surrounding the 1981 homicide.[3]

Hickey testified that West came from a chemically dependent family, that West's chemical dependency began at age ten, and that it significantly impaired his judgment. He testified that addicts cannot reason normally and that they make increasingly bad decisions as their addiction progresses. He testified that extreme addictions cause "cognitive impairment[s]" similar to brain damage.

With regard to West's family, Hickey testified that West's father was an alcoholic and that West witnessed physical violence in the family from an early age. Hickey noted that West's father withdrew affection and refused to call the children by their names, calling them "pothead number one" and "pothead number two." On cross-examination, Hickey admitted that West's prognosis was poor, noting that West had dropped out of treatment programs in 1983 and 1986, but explaining that it is not uncommon for addicts to fail such programs on their first attempts.

At the close of evidence, West made a lengthy statement in which he denied any responsibility for the crime. The sentencing court found three aggravating circumstances: (1) that West previously committed a felony involving the use of violence upon another, (2) that West committed the present

---

[3]LuAnn St. Aubin and Mike Richmond, both of whom witnessed the 1981 homicide, testified that the victim was a violent drug dealer who had been terrorizing people at a party and was participating in an attack on St. Aubin when West shot him. Although St. Aubin testified at the sentencing hearing that the victim had pulled a gun on West, she did not offer such testimony during the manslaughter trial, and Richmond provided a contrary account. According to Richmond, when West pointed a gun at the victim, the victim taunted him by saying he "didn't have the balls" to pull the trigger. West then shot him.

offense in expectation of pecuniary gain, and (3) that West committed the present

> offense in an especially cruel and heinous manner, in that, A, the [victim] was hogtied, bound and beaten repeatedly; B, death was not immediate, the deceased was left dying and in a position unable to seek assistance; and C, that the defendant knew or had reason to know that the deceased was dying or had suffered serious physical injuries.

The court found West's emotionally deprived childhood and substance abuse problem to be mitigating, but not sufficiently so as to outweigh the aggravating factors. It sentenced West to death.

## C.    State Post-Conviction Proceedings

West appealed his conviction and sentence to the Arizona Supreme Court, which affirmed both in a published opinion on September 30, 1993. *State v. West*, 862 P.2d 192 (Ariz. 1993).

Prior to filing his petition for post-conviction relief, West filed a request in Pima County Superior Court for the appointment of a mental health expert, a pharmacologist, and an investigator to help prepare his petition.[4] At the hearing on this motion, West's counsel, Carla Ryan ("Ryan"), stated that she sought a mental health expert because West had recently "taken a turn for the worse" and was writing "gibberish." She said nothing about West's purported mental impairments or evidence that trial counsel allegedly failed to present at sentencing. The court granted the motion as to the investigator but denied funds for a mental health expert or pharmacologist,

---

[4]In addition to other claims, West alleged that someone else had murdered Bortle, and he sought assistance in investigating this theory. West does not advance this theory in the present appeal.

indicating that it would reconsider if Ryan could present more specific information about the need for such experts.

West filed his petition for post-conviction relief in Pima County Superior Court on March 15, 1996. He raised numerous claims, including ineffective assistance of counsel at sentencing. On March 26, 1996, Ryan again requested funding for experts and discovery and specifically sought funds for a formal consultation with Dr. Thomas Thompson, a psychiatrist with whom she had discussed West's case, and who allegedly told her that testing could be done to explore West's "possible epileptic seizures leading to blackouts."[5] It is unclear whether or not the trial court ruled on this request before West filed a motion for an evidentiary hearing on July 17, 1996. The bulk of this motion sought a hearing on issues not relevant to the present appeal, but it also alleged that trial counsel failed to have Drs. Allender and Overbeck perform brain scans and other tests on West, and that without such tests "there [was] no way to know exactly what potential mitigation could have been presented." The superior court denied the petition without an evidentiary hearing.

In a motion for reconsideration, Ryan—for the first time—supported her request for funding and an evidentiary hearing with an affidavit. Ryan's affidavit recounted her conversation with Dr. Thompson, who believed West might benefit from further neurological testing. The court denied the motion and West filed a petition for review with the Arizona Supreme Court. Among other claims of error, he challenged the denial of his requests for an evidentiary hearing and expert funding. The Arizona Supreme Court summarily denied the petition.

---

[5]West does not allege in this appeal that counsel failed to explore an alleged "seizure-related impairment." Other than a single notation in a 1983 hospital record indicating that West claimed to have had a seizure from a drug overdose years earlier, there is no evidence that he suffered from seizures.

### D.    Federal Habeas Proceedings

On May 6, 1998, West filed a timely petition for a writ of habeas corpus in district court, raising thirty-two claims. It included a claim for ineffective assistance of sentencing counsel based on the alleged failure to investigate and present "valid mental health mitigation," including evidence of head injuries, "continual[ ]" psychiatric counseling, and a "possible" cognitive impairment. West also alleged that counsel performed deficiently by failing to present Dr. Allender's report at sentencing. West asked for "an opportunity to present his arguments in an evidentiary hearing" after allowing him time "to investigate, hire experts, and properly prepare."

The district court denied West's penalty phase ineffective assistance of counsel claim on the merits without a hearing. It reasoned that counsel's

> strategy at sentencing was to focus on the damaging effects of Petitioner's dysfunctional childhood and long-term addiction to drugs and alcohol and to emphasize that Petitioner was basically a good person who with the proper help could be rehabilitated. This was a sound strategy, and Petitioner has offered no support for the proposition that emphasizing evidence of cognitive impairments due to head injuries —if such evidence existed—would probably have led to a different sentence.

In denying West's request for an evidentiary hearing, the district court assumed without deciding that West had been diligent in seeking a hearing in state court, but held that a hearing was unnecessary because the record "clearly show-[ed] that counsel presented a strong case in mitigation based on a thorough investigation of Petitioner's background." Further, the district court reasoned that "a review of the entire record indicate[d] that the facts now alleged by Petitioner,

even if proved true, would not entitle him to relief on this claim."

The district court granted West a certificate of appealability as to his claim of ineffective assistance of counsel at sentencing. On appeal, West argues that the district court erred in denying this claim without first granting him an evidentiary hearing.

## II.   Discussion

We review the district court's denial of a habeas petitioner's request for an evidentiary hearing for abuse of discretion. *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007); *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).

### A.   Diligence

**[1]** The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs this case, prohibits an evidentiary hearing where a petitioner has not been diligent in pursuing his claims in state court. 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence . . . depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court," and requires "in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 435, 437. "We review de novo whether," due to a lack of diligence, AEDPA "removes from the district court's discretion the decision to grant or deny a request for an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).

**[2]** Although respondent contends that AEDPA precluded an evidentiary hearing in district court due to West's lack of diligence in state court, the record reveals West's persistent, though imperfect, efforts to obtain a hearing. We acknowl-

edge that many of his requests for an evidentiary hearing concerned other theories of relief and otherwise failed to specify the "mental impairment" evidence that trial counsel allegedly failed to investigate.[6] We also note that, contrary to the requirements of Arizona Rule of Criminal Procedure 32.5, West failed to support his requests for a hearing with sworn affidavits.[7]

[3] However, despite these deficiencies, the record shows that West sought a hearing and funding for experts on more than one occasion in an effort to develop his claim that he suffered from mitigating mental impairments. *Cf. Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir. 2001) (concluding that AEDPA prohibited a remand for an evidentiary hearing where petitioner never sought a hearing in state court). Accordingly, we, like the district court, assume that West was diligent for purposes of AEDPA.[8]

### B. No Abuse of Discretion in Declining to Hold a Hearing

#### 1. *Governing Standards*

[4] To obtain an evidentiary hearing in district court, a

---

[6]Because trial counsel and sentencing counsel were the same, we use these terms interchangeably.

[7]Arizona Rule of Criminal Procedure 32.5 provides, in relevant part: "Facts within the defendant's personal knowledge shall be . . . under oath. Affidavits, records, or other evidence currently available to the defendant supporting the allegations of the petition shall be attached to it."

[8]We reject respondent's contention that West "abandoned" his "mental impairment claim" in district court. Although West's request for an evidentiary hearing in district court focused on other issues, he nonetheless made specific allegations concerning ineffective assistance of sentencing counsel, and he arguably sought to develop that issue at a hearing. Even though he did not request funds for mental health experts in district court, respondent cites no law holding that such a failure is tantamount to abandonment of claim.

habeas petitioner must, in addition to showing diligence in state court, allege a colorable claim for relief. *See Landrigan*, 550 U.S. at 474-75; *Earp*, 431 F.3d at 1167. To allege a colorable claim, he must allege facts that, if true, would entitle him to habeas relief. *Landrigan*, 550 U.S. at 474. Thus, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations," and whether those allegations, if true, would entitle him to relief. *Id.* "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Furthermore, because AEDPA's deferential standards "control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.*; *see also Earp*, 431 F.3d at 1166-67.

Under the familiar AEDPA standard, a federal court may not grant "habeas relief unless a state court's adjudication of a claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or the relevant state-court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Landrigan*, 550 U.S. at 473 (quoting 28 U.S.C. § 2254(d)) (internal citations omitted).

The relevant Supreme Court law governing West's penalty phase ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668 (1984). To establish a colorable claim of ineffective assistance of counsel, a petitioner must satisfy *Strickland*'s two-pronged test by showing that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-88, 694; *see also United States v. Thomas*, 417 F.3d 1053, 1056 (9th

Cir. 2005) (reciting "the familiar, two-part test of *Strickland*").

"Judicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466 U.S. at 689. Thus, "counsel is strongly presumed to have . . . made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Furthermore, the Supreme Court has recently reiterated that "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

### 2. *No Colorable Claim under the First Prong of* Strickland

Applying the deferential AEDPA and *Strickland* standards to the present case, we conclude that the district court did not abuse its discretion in denying West's claim without an evidentiary hearing. Although the state court did not explain its reasons for denying West's claim of ineffective assistance of sentencing counsel, our independent review of the record compels us to conclude that its decision on this issue was reasonable. *See Richter v. Hickman*, 578 F.3d 944, 951 (9th Cir. 2009) (en banc), *cert. granted sub nom. Harrington v. Richter*, 130 S. Ct. 1506 (Feb. 22, 2010). Moreover, the district court did not abuse its discretion in denying West's claim without an evidentiary hearing because West failed to raise factual disputes that, if decided in his favor, would present a colorable claim under the first prong of *Strickland*.

[5] First, we reject West's contention that counsel's initial reliance on an erroneous legal theory, and the allegedly resultant delay in investigating mitigating evidence, constituted deficient performance. Although West argues that counsel's initial reliance on the "felony murder" argument delayed the

investigation until after trial, the record shows that counsel acted promptly to investigate possible mitigation defenses. Counsel were appointed in late July 1987, and by September they had arranged for an evaluation by Dr. Overbeck. Soon thereafter, counsel retained Dr. Allender to evaluate West for possible cognitive impairments resulting from purported head injuries and alcohol abuse. At the initial sentencing hearing, Dawley indicated that the evaluations had been conducted for purposes of mitigation, but that he and his co-counsel ultimately found them unsupportive. Accordingly, it is clear that counsel promptly made appropriate mitigation inquiries and did not wait until after trial to begin their investigation.[9]

[6] Furthermore, any delay between counsel's initial mitigation investigation and their subsequent post-trial investigation was immaterial. Despite counsel's initial reliance on an unavailing legal argument regarding the applicability of the death penalty to West, the record shows that, after the trial, court rejected that argument, counsel capably used multiple extensions of time to marshal a substantial amount of mitigating evidence concerning West's substance abuse, his family background, and the extenuating circumstances surrounding his prior homicide conviction. During the nearly three months between the initial sentencing hearing and the August 1 hearing, counsel sent investigators out of state to interview thirteen different witnesses; they gathered records from West's multiple Illinois incarcerations and information about his 1981 conviction; they solicited letters from West's family and friends; and, they retained a substance abuse expert who con-

---

[9]West argues that counsel did not comply with the 1989 ABA Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases, which exhort counsel to launch a full-scale mitigation investigation immediately after appointment. However, the Supreme Court has held that the ABA guidelines are "only guides," and may only be relevant to the extent they reflect prevailing norms at the time of counsel's performance. *Bobby v. Van Hook*, 130 S. Ct. 13, 17 & n.1 (2009) (per curiam). Under *Van Hook*, the 1989 guidelines are inapplicable to the present case since they did not come into effect until after West's trial. *Id.*

ducted a thorough review of West's background. Counsel presented all of this evidence to the sentencing judge, and counsel then effectively used Hickey's testimony to establish the severity of West's substance abuse and to suggest that it resulted in problems similar to those caused by a cognitive impairment.

[7] Given counsel's considerable and productive efforts during this time period, we cannot say that any delay caused by their initial approach amounted to constitutionally deficient performance. Moreover, West fails to explain how an evidentiary hearing would allow him to establish ineffective assistance of counsel regarding this aspect of their representation.

[8] We likewise reject West's contention that counsel performed deficiently by failing to provide Dr. Allender with a more complete picture of his family, prison, and social background prior to the evaluation and by failing to follow up on purported "red flags" in the subsequent report. West relies on the pre-AEDPA case of *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002), to argue that counsel should have given Dr. Allender more extensive information about his background prior to the evaluation. However, unlike counsel in *Caro*, who were aware of the petitioner's "extraordinary history of exposure to pesticides and toxic chemicals" yet failed to inform the experts who examined him of these facts, *see id.* at 1254, here, there is no indication that, at the time of Dr. Allender's examination, counsel knew about West's dismal family background or that such information would have been relevant to an examination exploring a suspected "organic impairment." Indeed, during his evaluation, West downplayed the emotional abuse he suffered as a child, and there is no indication that he had been more forthcoming with counsel. Moreover, the record indicates that West did, in fact, provide Dr. Allender with information relevant to his psychiatric and social history. For example, he told Dr. Allender that he did not complete seventh grade, had received counseling in Illi-

nois state prison, and had begun using drugs at an early age and continued to use them. Thus, there is no evidence that counsel's actions somehow impeded Dr. Allender's ability to perform a thorough neuropsychological evaluation.[10]

Furthermore, contrary to West's assertions, there were no "red flags" that counsel overlooked in Dr. Allender's report. Although the report mentioned that West had been given psychoactive medication upon his initial incarceration, it also noted that West was no longer taking the medication, that his thinking had cleared, and that he was currently relying only on Tryptophan for sleep. West has never submitted affidavits or other evidence indicating that this brief period of medication was for treatment of something other than detoxification or aid in sleeping. Further, although West told Dr. Allender that he was currently depressed and had suicidal thoughts, he said nothing to suggest a history of mental illness that might be relevant to mitigation. *Cf. Rompilla v. Beard*, 545 U.S. 374, 391-93 (2005) (finding deficient performance where counsel failed to examine files related to petitioner's prior convictions, which indicated he suffered from schizophrenia and other disorders); *Lambright v. Stewart*, 241 F.3d 1201, 1207 (9th Cir. 2001) (remanding for an evidentiary hearing where counsel failed to obtain a psychiatric evaluation despite his awareness of evidence indicating petitioner's hospitalization in a mental facility and two prior suicide attempts); *Earp*,

---

[10]West attempts to prove otherwise by submitting for the first time in this appeal a letter written by Dr. Allender in 2008—more than twenty years after his initial evaluation of West in 1987. Even were we to overlook the tardiness of this evidence, it does not establish deficient performance with respect to Dr. Allender's evaluation. In the letter, Dr. Allender indicates only that, had he known the extent of West's abusive childhood, he would have done "additional questioning" and "may have" diagnosed West with post-traumatic stress syndrome, which he opined "may have helped the judge to understand the source of Mr. West's drinking and drug problems" and difficulty staying in treatment. These equivocal statements fail to undermine the state court's conclusion that sentencing counsel provided constitutionally sufficient performance.

431 F.3d at 1177-78 (remanding for an evidentiary hearing where counsel failed to do follow-up investigation of records indicating that petitioner had a history of troubled mental health).

[9] Indeed, the record shows that West's "history" of psychiatric treatment was situational and unremarkable. Records from one period of imprisonment in Illinois indicate that he had a few visits with a psychologist, but that the psychologist's primary diagnosis was "substance abuse." The same records mention possible "secondary" and "third" diagnoses of borderline personality disorder and "learning disability," respectively, but also note that West's intellect was not impaired, his insight and judgment were good, and that previous blackouts and amnesic attacks were from excessive drug use. Another record from a different period of incarceration shows that West talked to a psychologist when he was depressed about relationship problems with his girlfriend. These records, far from casting doubt on the reasonableness of counsel's performance, support their decision to focus on West's substance abuse as a primary mitigation factor.

Similarly, Dr. Allender's report, rather than revealing alleged deficits in "intellectual memory, language and perceptual functioning" as West contends, indicates that West had normal performance in those areas. Further, contrary to West's contention that counsel ignored the report's mention of his purported head injuries, the record shows that it was counsel who retained Dr. Allender in the first instance to evaluate whether the alleged injuries affected his neuropsychological functioning. Not incidentally, the record does not support West's claims of having suffered numerous head injuries, and West has never submitted any evidence to create a material factual dispute on this issue.[11] Dr. Allender, however,

---

[11]West told Dr. Allender that he tripped while running, fell on his head, and ruptured his spleen, but his 1983 hospital records indicate that his splenectomy was the result of a car accident. Further, West's claim about

accepted West's contentions as true, but nonetheless concluded that the "results . . . [of the evaluation were] more consistent with an individual of low educational status who may have some evidence of a learning disability" than with any cognitive impairment resulting from head injuries or substance abuse.

The only arguably abnormal finding by Dr. Allender was that West's right hand was "somewhat" slow and "did not demonstrate the expected right hand advantage." Based on this finding, Dr. Allender commented that a cognitive impairment could not be "ruled out" absent further testing. However, such an equivocal finding, in light of his ultimate conclusion that the test results were more consistent with someone of a "low educational status" than with a cognitive impairment, is not the kind of "powerful mitigating evidence" sufficient to overcome *Strickland*'s presumption that counsel acted reasonably in declining to investigate further the possibility that West might suffer from a cognitive impairment. *See Van Hook*, 130 S. Ct. at 19 (citing *Rompilla*, 545 U.S. at 389-93).

**[10]** In the same vein, it was not objectively unreasonable for counsel not to introduce Dr. Allender's underwhelming report at sentencing. At the initial sentencing hearing, counsel indicated that they did not believe the report was "worth" bringing to the court's attention. This was a reasonable strategic decision as Dr. Allender concluded that West did not have any impairments. Counsel also acted reasonably by declining to present the report at the second hearing because doing so would have risked undermining Hickey's testimony that

---

being thrown on his head while in Illinois state prison is inconsistent with the related medical records. Contrary to West's assertion that he could not move one side of his body after this incident and that the prison hospital wanted to admit him, the medical records indicate that West could move all of his extremities, had normal x-rays, and left the emergency room in fair condition with follow-up to be provided "as needed."

severe addiction can result in cognitive impairments and actual brain damage. Indeed, Hickey, a "substance abuse expert," was able to offer such an opinion without the risk of impeachment that Dr. Allender would have faced. In other words, if Dr. Allender had testified that West's cognition was impaired, the prosecution surely would have impeached such testimony with his contrary written report. Furthermore, even if defense counsel had just introduced the report, the prosecution could have used it to impeach Hickey's testimony that severe addiction could result in cognitive impairments.

For these same reasons we reject West's contention that counsel performed deficiently by retaining Hickey rather than a true "mental health" expert. The record shows that Hickey presented persuasive testimony about the links between West's childhood, his substance abuse, and its effects on his judgment. West fails to explain how a "mental health expert" could have offered more compelling evidence, especially when there was no evidence that he actually suffered from a cognitive impairment.

**[11]** As the Supreme Court recently emphasized in *Van Hook*, "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." 130 S. Ct. at 17 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)). Here, the record shows that, in light of Dr. Allender's underwhelming evaluation, counsel reasonably chose not to investigate further the possibility that West suffered from a cognitive impairment and to focus instead on West's long-standing substance abuse and his dysfunctional family background. Counsel made efficient use of a nearly three-month extension of time to marshal numerous witnesses and an expert to testify in support of these factors. They also ably presented evidence of the extenuating circumstances surrounding his prior manslaughter conviction. *Cf. Williams*, 529 U.S. at 395 (finding deficient performance where counsel began mitigation investigation one week prior to trial and failed to uncover extensive records graphically describing

petitioner's nightmarish childhood); *Allen v. Woodford*, 395 F.3d 979, 1002 (9th Cir. 2005) (finding deficient performance where counsel had only one week in which to prepare the witnesses and evidence, contacted only a few of more than twenty-six potential witnesses, and failed to request a continuance).

**[12]** West has failed to cite any potentially powerful mitigating evidence that counsel overlooked, nor has he raised any factual disputes regarding counsel's performance that require resolution in an evidentiary hearing, and that, if decided in his favor, would entitle him to relief.[12] Accordingly, we conclude that West has failed to raise a colorable claim of deficient performance under the first prong of *Strickland*, and therefore, we do not reach the second, "prejudice" prong of the *Strickland* analysis.[13] Thus, based on our independent but deferential review of the record, we conclude that it was not unreasonable for the state court to deny West's penalty phase claim of ineffective assistance of counsel and that the district court did not abuse its discretion in denying that claim without an evidentiary hearing.

---

[12]For the first time on appeal, West submits a 2008 letter from Dr. Richard M. Kolbell, Ph.D., who opines that West has "episodic dyscontrol" (an impulse control disorder characterized by periods of rage and violent behavior) and Attention-Deficit/Hyperactivity Disorder. Dr. Kolbell opines that both conditions have a "prominent organic basis," and that it would have been "reasonable" to explore these at the time of West's trial and sentencing. Even overlooking the tardiness of this new evidence, it nonetheless fails to establish West's entitlement to an evidentiary hearing, as it is speculative in nature and does not establish deficient performance. These diagnoses were not obvious from the record at the time of sentencing, and the episodic dyscontrol diagnosis would have been inconsistent with presenting West as non-violent and the murder as accidental.

[13]To the extent that West seeks a hearing in order to develop "new" mitigating evidence in the first instance, AEDPA prohibits such proceedings. *See Williams*, 529 U.S. at 437 (explaining that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues" that were not developed in state proceedings).

## III.   Conclusion

The present record, when viewed through the deferential lenses of AEDPA and *Strickland*, does not support West's claim that counsel failed to provide effective assistance at sentencing. West has pointed to no potentially powerful mitigating evidence that counsel overlooked or failed to develop, nor has he alleged facts that, if decided in his favor, would establish a colorable claim under the first prong of *Strickland*. Accordingly, there is nothing to be determined in an evidentiary hearing, and the district court did not abuse its discretion by denying his claim without one.

**AFFIRMED.**