**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS PAUL WEST,

*Petitioner,*

v.

CHARLES L. RYAN,

*Respondent.*

No. 11-71987

ORDER

Filed July 18, 2011

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw, and
Consuelo M. Callahan, Circuit Judges.

---

## COUNSEL

For petitioner-appellant West: Jon M. Sands, Arizona Federal
Public Defender, Timothy M. Gabrielson, Paula K. Harms,
Assistant Arizona Federal Public Defenders, Tucson, Arizona.

For respondent-appellant Ryan: Thomas C. Horne, Attorney
General, Jonathan Bass, Assistant Attorney General, Tucson,
Arizona.

---

## ORDER

Thomas Paul West applies to this court for authorization to
file a second or successive petition for a writ of habeas corpus
in the District of Arizona. *See* 28 U.S.C. § 2244(b)(3). We
deny his application.

## BACKGROUND

West was convicted of first-degree felony murder, second
degree burglary, and theft in March 1988. In our opinion

9701

denying his first federal habeas petition, we set out the facts surrounding the murder and trial:

> West moved to Arizona from Illinois in June 1987. While living in Tucson with a family friend, he met Donald Bortle ("Bortle"). Bortle had various items for sale in his home, including assorted electronic equipment and videotapes of popular movies. West's friend wanted to buy some things from Bortle, and West accompanied her to his house. About two weeks later in mid-July 1987, West broke into Bortle's home, beat him severely about the head, and bound his limbs. He left Bortle to die, stealing his car and various other items, including several pieces of electronic equipment.
>
> West transported the stolen goods to the desert where he hid them, and then drove to Glendale where some of his friends lived. After retrieving the goods from Tucson with an acquaintance, West returned to Glendale and spent a couple of days with his friends. **FN1** He made several allusions to beating up and robbing "some guy," but expressed no remorse about it. West then absconded to Illinois with much of the stolen property. Soon thereafter, one of West's acquaintances contacted the Pima County Sheriff's Office, and an investigation led officers to Bortle's home where they discovered his dead and decaying body. His hands and feet were bound with a vacuum cleaner cord and lamp wire, and he had extensive fractures on the right side of his face. The fractures were so severe that his hard pallet had detached from his skull. The coroner estimated that he had bled to death within forty-five minutes to an hour after the beating.
>
> **FN1**. The record shows that West was buying and taking large amounts of drugs around the time of the

> murder and immediately thereafter. Defense counsel successfully excluded this evidence from trial but introduced it during sentencing to establish the extent and effects of West's substance abuse.
>
> West was arrested in Illinois when the car in which he was riding was stopped for speeding, and the officer discovered he was wanted for murder in Arizona. A search of the car revealed several pieces of electronic equipment and other items stolen from Bortle's home.

*West v. Ryan*, 608 F.3d 477, 480 (9th Cir. 2010). We also set out the facts surrounding West's sentencing. Because West challenges his sentence, rather than his conviction, those facts are important here as well:

> The prosecution sought the death penalty, citing the following aggravating factors: (1) the murder was committed for pecuniary gain; (2) the murder was committed in an especially cruel and heinous manner; and (3) West had a prior conviction for a crime of violence (a 1981 manslaughter conviction). **FN2**
>
> **FN2**. The record contains conflicting information as to whether the conviction was for voluntary or involuntary manslaughter.
>
> At the initial sentencing hearing on May 4, 1988, West's counsel argued that a conviction for felony murder precluded imposition of the death penalty. Dawley[, West's counsel,] indicated that, as "a matter of strategy," he and [co-counsel] Fiorillo chose to rely solely on this "legal argument" and not to present mitigation witnesses. Dawley said that they had looked for mitigating factors, explaining that West had been "examined" from "a mental health stand-

point," but that he and Fiorillo had determined that the evidence "was not worth bringing" to the court.

The judge disagreed with the defense's legal theory that the death penalty could not be imposed for a felony murder conviction and asked West if there was anything he wished to say prior to sentencing. West indicated that there were a lot of people who would testify that he was not a "wicked mad man," but that he did not feel like "dragging them in" because he felt the court had already made up its mind. The court responded that it would consider any such evidence and would delay sentencing so that West could present it. West agreed, and the court rescheduled the hearing for June 6.

On May 11, Dawley sought and obtained another continuance, delaying the sentencing hearing until August 1. During the interim, defense counsel sent two investigators to Illinois and Oklahoma to interview thirteen witnesses about West's childhood, drug addiction, and the circumstances surrounding the earlier 1981 homicide. Counsel also retained a substance abuse expert, Terry Hickey ("Hickey"), who interviewed West, West's mother, his brother, and LuAnn St. Aubin (West's girlfriend at the time of the 1981 homicide). Hickey reviewed the transcripts of the interviews with West's family and friends, as well as West's Illinois prison records, his medical records, and Dr. Allender's neuropsychological evaluation.

Meanwhile, the probation office submitted an amended presentence report ("PSR"), which described positive letters from West's father, grandmother, maternal aunt, and a family friend. The letter from West's father stated that West was well-liked and that drugs and alcohol were "the bottom line to

all of [his] problems." Other letters opined that West needed drug treatment and that he was a good person when he was not using drugs. The PSR took note of the numerous interviews conducted by the defense investigators and advised the court to consider that West's actions may have been the result of chronic and acute drug abuse, which may have reduced his ability to appreciate the wrongfulness of his actions. It also opined that West's actions may have resulted from an unstable and abusive home environment.

In its pre-hearing sentencing brief, the defense argued that West (1) had an emotionally deprived childhood, (2) suffered from substance abuse, which diminished his capacity to conform his conduct to social and legal norms, (3) could be rehabilitated, (4) did not intend to kill Bortle, (5) could not legally be put to death for felony murder, and (6) had acted in self-defense and defense of another in connection with his 1981 homicide conviction.

At the August 1 sentencing hearing, Hickey and five lay witnesses testified on West's behalf. The defense also submitted newspaper articles about the 1981 homicide, hospital records from West's drug-related hospitalizations in 1983 and 1986, a rap sheet from the Department of Justice, and transcripts of interviews with thirteen witnesses who discussed the extent of West's substance abuse, his emotionally deprived childhood, and/or the circumstances surrounding the 1981 homicide. **FN3**

**FN3**. LuAnn St. Aubin and Mike Richmond, both of whom witnessed the 1981 homicide, testified that the victim was a violent drug dealer who had been terrorizing people at a party and was participating in an attack on St. Aubin when West shot him. Although St. Aubin testified at the sentencing hearing that the

victim had pulled a gun on West, she did not offer such testimony during the manslaughter trial, and Richmond provided a contrary account. According to Richmond, when West pointed a gun at the victim, the victim taunted him by saying he "didn't have the balls" to pull the trigger. West then shot him.

Hickey testified that West came from a chemically dependent family, that West's chemical dependency began at age ten, and that it significantly impaired his judgment. He testified that addicts cannot reason normally and that they make increasingly bad decisions as their addiction progresses. He testified that extreme addictions cause "cognitive impairment[s]" similar to brain damage.

With regard to West's family, Hickey testified that West's father was an alcoholic and that West witnessed physical violence in the family from an early age. Hickey noted that West's father withdrew affection and refused to call the children by their names, calling them "pothead number one" and "pothead number two." On cross-examination, Hickey admitted that West's prognosis was poor, noting that West had dropped out of treatment programs in 1983 and 1986, but explaining that it is not uncommon for addicts to fail such programs on their first attempts.

At the close of evidence, West made a lengthy statement in which he denied any responsibility for the crime. The sentencing court found three aggravating circumstances: (1) that West previously committed a felony involving the use of violence upon another, (2) that West committed the present offense in expectation of pecuniary gain, and (3) that West committed the present

offense in an especially cruel and heinous manner, in that, A, the [victim] was hogtied, bound and beaten repeatedly; B, death was not immediate, the deceased was left dying and in a position unable to seek assistance; and C, that the defendant knew or had reason to know that the deceased was dying or had suffered serious physical injuries.

The court found West's emotionally deprived childhood and substance abuse problem to be mitigating, but not sufficiently so as to outweigh the aggravating factors. It sentenced West to death.

*Id.* at 481-82.

West's conviction was affirmed on direct review by the Arizona Supreme Court on September 30, 1993. *State v. West*, 862 P.2d 192 (Ariz. 1993). The Supreme Court denied *certiorari* on April 25, 1994. *West v. Arizona*, 511 U.S. 1063 (1994). On March 26, 1996, West filed his first petition for post-conviction relief in state court, raising numerous claims including ineffective assistance of counsel for not presenting sufficient mitigation evidence at sentencing. The superior court denied the petition without a hearing, and the Arizona Supreme Court summarily denied the petition.

On May 6, 1998, West filed a timely petition for a writ of habeas corpus in the District of Arizona. On November 9, 2007, the district court denied West's third amended habeas petition. *West v. Schriro*, No 98-218 2007 WL 4240859. The court denied West's motion to reconsider on December 11, 2007. We denied his appeal in a published decision on June 10, 2010. *West v. Ryan*, 608 F.3d 477. The Supreme Court denied *certiorari* on February 22, 2011. *West v. Ryan*, 131 S. Ct. 1473 (2011).

Following the habeas appeals, Arizona moved for a warrant of execution, which was issued by the Arizona Supreme Court on May 24, 2011. The warrant set the execution for July 19, 2011. In opposing the warrant of execution, West filed a successive petition for post-conviction relief in the Arizona Superior Court, which that court denied on June 29, 2011. The Arizona Supreme Court summarily denied review on July 13, 2011, and West filed a petition for a writ of certiorari on July 15, 2011. That petition is currently pending. West filed the instant application pursuant to 28 U.S.C. § 2244(b)(3), seeking permission from the Ninth Circuit to file a second or successive petition for a writ of habeas corpus in the District of Arizona, on July 15, 2011.

## DISCUSSION

### I. West Raised The Claim of Ineffective Assistance in a Prior Petition

The first step in our consideration of West's application requires us to "determine whether a 'claim presented in a second or successive habeas corpus application' was also 'presented in a prior application.' " *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005). If it has, "the claim must be dismissed." *Id.* The Supreme Court has clarified that the term "claim" means "an asserted federal basis for relief from a state court's judgment of conviction." *Id.* West alleges that his claims have not been presented in a previous petition, but, at least as to his first claim, we are not convinced.

In his proposed second or successive petition, West makes two claims: (1) that sentencing counsel rendered ineffective assistance because they failed to adequately investigate his background and introduce evidence that would have invalidated all three statutory aggravating factors found by the sentencing court; and (2) that his recent diagnoses of post-traumatic stress disorder ("PTSD") rendered him ineligible for the death penalty because it invalidates all three aggravat-

ing factors. While the PTSD is a new wrinkle, we have seen at least the first of these claims before. Specifically, in claim A8 of his previous habeas petition, West contended that his counsel were ineffective at sentencing by failing to investigate and present mitigation evidence of West's impaired mental health, head injuries, childhood abuse, immaturity, substance abuse, and failure to complete drug rehabilitation. While the current proposed petition focuses on the effect the evidence of his childhood abuse would have on the aggravating factors rather than the mitigating effect, this is two sides of the same coin. West's complaint is that counsel should have discovered the truth about his childhood and the effect it had on his decision to murder Mr. Bortle.

The current claim adds nothing new except the contention that the investigation would have revealed his PTSD. However, even that is not truly new, because West argued the same thing to this court in his appeal of the prior habeas denial. In fact, West argued his PTSD warranted relief in seven different places in his opening brief of the first habeas appeal and three places in his reply brief. Because West's first claim regarding ineffective assistance of sentencing counsel was raised in a prior habeas petition, it must be dismissed. 28 U.S.C. § 2244(b)(1).

## II. Requirements For Filing Second or Successive Petition

Even if West's claims are distinct enough from those raised in his first petition so that we may consider them, we must dismiss his application unless he meets Antiterrorism and Effective Death Penalty Act's (AEDPA) stringent standards. 28 U.S.C. § 2244(b)(2)(B). "Permitting a state prisoner to file a second or successive federal habeas corpus petition is not the general rule, it is the exception, and an exception that may be invoked only when the demanding standard set by Congress is met." *Bible v. Schriro*, ___ F.3d ___, 2011 WL 2547617, *3 (9th Cir. June 28, 2011). Because West is not

claiming that a new rule of constitutional law supports his claim, this demanding standard requires that we dismiss his application unless

> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B). While West must satisfy both requirements to prevail in his application, he cannot satisfy either.

## A. The Evidence Could Have Been Discovered Previously

West must first demonstrate that the evidence he now presents is newly-discovered, *i.e.*, it "could not have been discovered previously through the exercise of due diligence." *Id.* West offers two pieces of evidence he deems newly-discovered. First, West asserts that he suffered physical and emotional abuse from his family and he was sexually molested by three different men during his childhood. This information was not brought out at trial or in mitigation during sentencing. Second, West was diagnosed after the trial and sentencing as suffering from PTSD. His medical experts opine that West was suffering from PTSD at the time he murdered Bortle.

### 1. Family and Sexual Abuse

West cannot demonstrate that the evidence of physical and emotional abuse by his family or sexual molestation is newly-

discovered because it could have been discovered before trial through the exercise of due diligence. In fact, West knew it all along, and it is undisputed that his counsel knew of at least some of the allegations of sexual abuse in 1996. Under the facts of this case, this was not newly-discovered information which could not have been discovered through the exercise of due diligence. *See King v. Trujillo*, 638 F.3d 726, 730 (9th Cir. 2011).

West now contends that his family life during his childhood was much worse than he had previously admitted. Prior to trial, West discussed his family life with Dr. Allender, a court-appointed psychologist, in 1987.[1] Dr. Allender reported on the interview:

> Mr. West characterizes his growing up years as problematic. He states that his father loved him a great deal and would get him almost anything he wanted. After his father's work schedule changed however, his older brother was left with the responsibility of getting him off to school. He states that his brother who is five years older was the person who started getting him involved with drugs.

In 2010, however, West reported a much different relationship with his parents in interviews with Dr. Smith, a clinical psychologist referred by the Arizona Federal Public Defender:

> "I was moving around constantly. My mom would dump me on anybody — neighbors, my grandma, any relative that would take me. I even stayed with

---

[1]West was evaluated by two neuropsychologists, Dr. Allender and Dr. Daniel Overbeck, in the fall of 1987. There is no record of Dr. Overbeck's evaluation, so it is unknown what West did or did not disclose to him. *See West v. Ryan*, 608 F.3d at 480-81. Even if he had disclosed the purported sexual abuse by the priest, it is entirely possible that a strategic choice was made not to pursue a related mitigation claim.

my friends' parents. At home, my mom and dad argued all the time. They had vicious physical fights. I just wanted to escape it — wanted it to stop, but they fought over everything. I would get in between to try to stop my dad from hurting my mom and then he would hit me. He hit us over and over. Bloodied my brother's nose, bloodied and bruised my mom. I would get so scared that they would kill one another that I would just scream at them. One time, I got so scared I pissed myself." Mr. West shared that he had no real relationship with his father. He explained that "My dad was basically absent except when he was terrorizing us. He never spent any time with us as a family, playing ball with my brother and me or anything. All he ever did was call me and my brother assholes, dumb shits, worthless mother fuckers. The neighbors called the police over and over again, but since dad was a fireman the police simply looked the other way. No charges were ever pressed, even when my mom was clearly beaten. My mom would get in the car and leave and then my dad would do the same thing, leaving me and my brother home alone for days at a time. That is what it was like growing up in my house — a fucking nightmare."

The only explanation for the stark difference in stories is in Dr. Allender's May 7, 2011 letter:

When asked specifically why he had told me he had a good relationship with his father back in 1987 he explained that his relationship with his father was like fire and ice. That his father would buy him lots of things like a go cart, a mini bike, a pinball machine when he was being nice, but then had the other side of being abusive physically and emotionally. He also described being in a bit of a stupor from the psychiatric medications he was on during the time [Dr. Allender] was evaluating him.

There is no question that, to the extent West contends his abusive home life is a mitigating factor, West knew about his home life and the alleged family abuse at trial and at sentencing. There is no legitimate reason for his failure to disclose it before this late date.

Dr. Allender's May 7, 2011 letter also describes West's failure to report sexual abuse:

> When asked why he never told people about his abuse Mr. West mentioned reasons often reported by victims including, "I was ashamed, I thought it was my fault," "no one wanted to hear about it," and "I tried to block it out." When asked why he had not brought these things up to me in 1987 he said that his attorney had suggested to him that he should only answer questions that I asked and not volunteer any other information, especially about the alleged crime.

Regardless, West was at all times aware of the three instances of sexual abuse he now raises. Notably, he does not argue that his counsel was ineffective for failing to inquire about sexual abuse. Rather, he complains only that counsel was not successful in discovering what West already knew and not getting the court to pay for yet another mental health expert.

Even if counsel had been successful in securing funding for another mental health expert, it is pure speculation that the information about his abuse would have come out. The mental health defense efforts at the time were not focused on West's background, but rather on whether he had an organic brain injury. Accordingly, it is by no means clear that the mental health expert, if appointed, would have addressed the psychological consequences of West's sexual abuse. West acknowledges that his post-conviction relief counsel was aware of one of the childhood sexual abuse allegations as early as 1996. While West identifies several requests for funding for defense

investigations that were denied in 1996 and 1997, the evidence shows that counsel diligently pursued mitigation evidence based on organic brain injury and substance abuse, but sexual abuse was at best peripheral. Similarly, after the Federal Public Defender took over West's representation in January 2008, it obtained a court order to have West evaluated by a neuropsychologist, who reported in August 2008 that West described childhood sexual abuse by the teacher and the priest. While that report was filed in this court, West did not raise any arguments based on the sexual abuse issue at any point in that first federal habeas proceeding.

To the extent West contends his first post-conviction relief counsel was ineffective for not discovering the sexual abuse in 1997 and for not obtaining funding to investigate, the facts do not support his claim. West's first post-conviction relief counsel, Carla Ryan, explained in her motion for a funded mental health expert, that West "apparently was sexually abused, on numerous occasions, by a teacher. Therefore, a mental health expert is also needed to explain how the family environment and the sexual abuse affected Petitioner's emotional development." The court denied this request, but did so without prejudice to bringing the motion again with additional evidence. Thus, West had ample incentive at the time to more fully disclose his background and history of sexual abuse. He might have satisfied the diligence requirement if he had done so then, but he chose not to.

West's primary argument regarding diligence is that we have already found he was diligent, citing *West v. Ryan*, 608 F.3d at 484-85. West misreads our prior opinion. We held that West's prior counsel had been diligent in seeking an evidentiary hearing regarding her need for funding for a mental health expert and investigator. We did *not* hold that West had been diligent in disclosing information about his childhood; he clearly was not. If we were to rule that West had been diligent in pursuing and developing evidence of sexual abuse and abuse by family members by failing to disclose the informa-

tion, even to his counsel, for twenty years, we would be creating a strong incentive for capital defendants to withhold the strongest mitigation evidence until the eve of execution. We are not prepared to create that incentive.

### 2.  PTSD

The state court concluded that although West's diagnosis of PTSD had not been made at the time of trial, West was not diligent in obtaining the diagnosis. We agree. Dr. Allender and Dr. Smith based their diagnoses on conversations with West regarding information known by him at the time of trial. There was no new information that led to the diagnoses; the only new turn of events is that West has now chosen to disclose that he is the victim of sexual abuse, which apparently resulted in his PTSD. West argues that his allegations of sexual abuse were only corroborated within the past few weeks. This proves too much, because Dr. Allender and Dr. Smith both diagnosed PTSD *before* the allegations of sexual abuse were corroborated.[2] Moreover, Dr. Allender first indicated that he suspected PTSD in his 2008 letter based only on the physical and emotional abuse in the West household growing up with no indication that West had been sexually abused. Thus, there is no legitimate reason why the diagnosis would not have been made in 1987, or at least by August 1, 1988, if West had disclosed the information he had available to him. *See State v. Jensen*, 735 P.2d 781, 784 (Ariz. 1987) (recognizing PTSD as a diagnostic mental disorder in 1983).

The evidence of family and sexual abuse is not newly discovered. While West's PTSD diagnosis was not made until

---

[2]There was evidence that indicated Fr. Burke, one of West's accused abusers, had previously sexually abused boys in the area around the same time. However, this does not conclusively corroborate West's claim that Fr. Burke abused *him*. More importantly, however, neither expert indicated they would not have believed West absent this corroboration, and at the time they reached their diagnoses there was no corroboration of the other two accused abusers.

well after the trial and sentencing, West at all times possessed the information that forms the basis of the diagnosis. Had West been forthcoming with the events of his childhood in 1987, there is no reason to think that the diagnosis would not have been made. West cannot withhold the information he claims is critical mitigating evidence and then complain when it is not considered. West chose not to reveal the information at trial and sentencing, and made at least a partial disclosure in his post-conviction proceedings in 1997. He cannot now claim that the information he chose to withhold for over 20 years is new.

## B.   The Actual Innocence Requirement

Even if the evidence were accepted as newly-discovered, we must still deny West's application unless it "would be sufficient to establish by clear and convincing evidence that . . . no reasonable factfinder would have found [him] guilty of the underlying offense." *Bible*, 2011 WL 2547617 at *3 (quoting 28 U.S.C. § 2244(b)(2)(B)(ii)). Here, West challenges only his death sentence, and not his conviction. When a "capital defendant challenges his death sentence in particular, he must show by 'clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty in light of the new evidence." *Calderon v. Thompson*, 523 U.S. 538, 559-60 (1998) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 348 (1992)). Thus, West has the burden of showing, by clear and convincing evidence, that no reasonable sentencing judge aware of his family and sexual abuse and resulting PTSD would have sentenced him to death.

The state trial court found three aggravating circumstances in the penalty phase: (1) prior conviction of a violent crime in Illinois; (2) murder committed for pecuniary gain; and (3) murder committed in an especially cruel and heinous manner. West contends each of these findings is completely negated by the PTSD diagnosis and, had the sentencing court known

of his PTSD, it would not have been able to sentence him to death.

### 1. Prior Conviction of Violent Crime — 1981 Manslaughter

West contends that had the Illinois judge in 1981 known West suffered from PTSD, he would not have convicted him, and therefore the prior Illinois conviction should not have been considered by the Arizona court. The Supreme Court has held "that once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid." *Lackawana Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 403 (2001). The Court noted a possible exception to this rule in a case where, "after the time for direct or collateral review has expired, a defendant may obtain *compelling evidence* that he is actually innocent of the crime for which he was convicted, and *which he could not have uncovered in a timely manner*." *Id.* at 405 (emphasis added).

West has not presented "compelling evidence" of actual innocence. In support of this argument, he submitted a letter from the Illinois judge (unsworn, but declared to be "true to the best of [the judge's] information and belief") in which, 30 years after the fact, the judge states "I may well have acquitted Mr. West at that bench trial had I known that he suffered from PTSD at the time of the shooting."

This evidence is insufficient to meet the "compelling evidence" standard for at least two reasons. First, there is no evidence establishing that West suffered from PTSD at the time of the 1981 shooting.[3] Second, the evidence on which this

---

[3]Both Dr. Smith and Dr. Allender opine that West was suffering PTSD in 1987. Neither states that he suffered PTSD prior to 1987 in general, or specifically in 1981 at the time he shot and killed Billy Oldham at a party (because another girl was beating up his girlfriend).

argument rests, the physical and emotional abuse and sexual abuse, was known to West since 1981. Even if PTSD was not a recognized diagnosis in 1981, it was in 1983. *See State v. Jensen*, 735 P.2d at 784 (noting that the "American mental health community" recognized PTSD as a diagnostic mental disorder in 1983). West failed to contest the conviction for 30 years.

Most importantly, however, is the requirement that "the challenged prior conviction must have adversely affected the sentence that is the subject of the habeas petition." *Coss*, 532 U.S. at 406. West cannot show that his prior manslaughter conviction had the requisite adverse affect on his current sentence. In affirming West's death sentence, the Arizona Supreme Court accepted "the trial judge's finding that the circumstances of defendant's previous manslaughter conviction were not mitigating," but nonetheless stated that "we believe this to be an appropriate death penalty case even if it be assumed that the Illinois voluntary manslaughter conviction was not properly proved." *State v. West*, 862 P.2d 192, 211, 212 n.4 (Ariz. 1993).

### 2. Murder Committed for Pecuniary Gain

The mere showing that a murder occurred during the commission of a robbery is not sufficient to establish that the murder was committed with the expectation of pecuniary gain. *Woratzeck v. Stewart*, 97 F.3d 329, 334 (9th Cir. 1996). "To establish the pecuniary gain aggravating circumstance, the state must prove that the expectation of pecuniary gain was a motive, cause, or impetus for the murder and not merely a result of the murder." *State v. Prasertphong*, 76 P.3d 438, 440 (Ariz. 2003) (internal quotation and alteration omitted). West contends that the murder was committed due to an exaggerated startle response attributable to his PTSD, and was nothing more than a killing during a "robbery gone bad." The circumstances surrounding Bortle's murder do not support the argument.

West intended to steal Bortle's property. West had been to Bortle's house shortly before the murder and carefully examined the extensive amount of electronics equipment Bortle had for sale. Moreover, West ran out of cocaine on the day of the murder and did not have enough money to buy more. When Bortle interrupted him, West savagely beat Bortle, hogtied him stuck him in a closet, and left him to die. And then West continued to do what he came for — he stole Bortle's electronic equipment and then stole his car to carry it away. West's alleged PTSD may help explain why West was motivated to steal Bortle's property, but it does nothing to undermine the finding the murder was committed for pecuniary gain. West offers no other explanation for the savageness of the beating he inflicted upon Bortle or hogtying him and leaving him in the closet other than to allow him to complete the robbery.

### 3.    Especially Cruel and Heinous Manner of Killing

West contends that because he was suffering from PTSD, no reasonable factfinder could have found the manner in which he killed Bortle was especially cruel or heinous. While West offers conclusory statements that a PTSD diagnosis would defeat the factors used to establish heinousness, he does not actually explain how PTSD affects any of the factors that the court weighed to establish that the manner in which he murdered Bortle was especially cruel and heinous. Rather, he primarily argues that the evidence was insufficient to establish the factors. West submits that an exaggerated startle response stemming from his PTSD explains his reaction. However, while a startle response might explain an initial, violent reaction, it does nothing to explain why West took further affirmative actions to hogtie Bortle, to move him into a closet where he left him to die, or why, after that savage outburst, he went on to steal Bortle's possessions and his car. Moreover, it does nothing to undercut the evidence of his behavior after the murder. Lisa Murray testified that she overheard West tell Richard Wojahn that West had "beat the fuck

out of this old man and thrown him in a closet" in Tucson. When Lisa confronted him, West told her "not to worry about it" and that she "would have to live with it." He also bragged to others about getting cuts and bruises on his hand from beating up "the old man he ripped off." *State v. West*, 862 P.2d at 208. Taken together with the evidence of the cold-blooded and methodical nature of the crime itself, this severely undercuts West's argument that this aggravating factor would have been negated by evidence that he committed the crime in the midst of a startle response.

West's argument that he is actually innocent of the death penalty under *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987), fails because his cruel, calculated conduct in hogtying Bortle and abandoning him to die following the beating shows "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death [and] represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Id.*; *see also Landrigan v. Trujillo*, 623 F.3d 1253, 1257-58 (9th Cir. 2010). West's reliance on the trial testimony of the prosecution pathologist suggesting that Bortle may have been rendered unconscious by the first blow does not advance the *Tison* claim. Even if the PTSD startle response theory were accepted, and even if Bortle had been rendered unconscious right away, it would not overcome West's subsequent behavior of binding the bloody victim, throwing him in a closet, and leaving him to die while later boasting about what happened.

West has not shown that a PTSD diagnosis would have changed the outcome of any of the three aggravating factors found by the sentencing court. At best, it would have supported the mitigating factor the court found — his family life. However, he has not satisfied his burden of showing, by clear and convincing evidence, that strengthening this one mitigating factor would have mandated a different outcome.

## CONCLUSION

West has not satisfied his burden of proving, by clear and convincing evidence, that the evidence he now proffers is newly-discovered or that no reasonable factfinder would have found him eligible for the death penalty had he been aware of the evidence. Accordingly, West's application to file a second or successive petition for writ of habeas corpus is **DENIED**.