**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD A. LEAVITT,
　　　　　*Petitioner-Appellee,*

v.

ARVON J. ARAVE, of the Idaho
State Prison,
　　　　　*Respondent-Appellant.*

No. 08-99002

D.C. No.
CV-93-00024-
S-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
October 13, 2009—Pasadena, California

Filed May 17, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Pamela Ann Rymer, Circuit Judges.

Opinion by Chief Judge Kozinski;
Dissent by Judge Reinhardt

## COUNSEL

L. LaMont Anderson (argued), Deputy Attorney General, Chief, Capital Litigation Unit, Criminal Law Division, Boise, Idaho, for respondent-appellant and Lawrence G. Wasden, Attorney General of Idaho, Boise, Idaho.

David Z. Nevin (argued), Nevin, Benjamin, McKay, & Bartlett, LLP, Boise, Idaho and Andrew Parnes (argued), Ketchum, Idaho, for petitioner-appellee.

## OPINION

KOZINSKI, Chief Judge:

With fifteen strokes of his knife, Richard Leavitt slashed and stabbed Danette Elg to death in her bedroom. Then, as Ms. Elg lay dying on top of her punctured waterbed, Leavitt hacked out her womanhood—just as his ex-wife had seen him do to "play[ ] with the female sexual organs of a deer." *State* v. *Leavitt* (*Leavitt I*), 775 P.2d 599, 602 (Idaho 1989). We decide whether Leavitt's lawyer rendered ineffective assistance of counsel while trying to have him acquitted of the death penalty.

### Facts

Our first opinion in this case recounts the facts of Leavitt's crime and trial. *See Leavitt* v. *Arave* (*Leavitt III*), 383 F.3d 809 (9th Cir. 2004). We repeat only those relevant to this appeal. Jay Kohler and Ron Hart represented Leavitt at trial and sentencing. After the jury convicted Leavitt of murder, Kohler and Hart moved for appointment of a mental health expert to evaluate Leavitt for sentencing purposes. The trial court granted the motion and appointed Dr. David Groberg, a forensic psychologist, to perform the evaluation.

Dr. Groberg diagnosed Leavitt with antisocial personality disorder and intermittent explosive disorder. He reported that Leavitt was otherwise "of average intelligence with no serious deficits in his cognitive abilities." Although he opined that these disorders rarely have a physiological cause, Dr. Groberg recommended that Leavitt receive neurological testing to be sure. Kohler and Hart moved for such an examination, which the trial judge granted.

Dr. Jaynes's neurological examination of Leavitt revealed "no evidence of higher cerebral dysfunction" nor any "objective neurological deficit." Nevertheless, Dr. Jaynes believed

that Leavitt's CT scan showed a "very slight cortical cerebral atrophy . . . . [that] may or may not have an effect on his cognative [sic] function." Based on this finding, Dr. Jaynes suggested further testing. The trial judge denied the motion for an MRI, stating that additional mental health evidence would not be a significant factor in sentencing. At the conclusion of the hearing, the trial judge found that the aggravating factors outweighed the mitigating evidence and sentenced Leavitt to death.

David Parmenter then replaced Kohler and Hart as Leavitt's counsel. Parmenter represented Leavitt in his appeal to the Idaho Supreme Court and succeeded in having the death sentence vacated. On remand, at the second sentencing hearing, Parmenter made a strategic decision to focus on convincing the judge that Leavitt was a "good guy" rather than pursue the mental health angle that had proven unsuccessful at the first sentencing. Despite this change in strategy, the trial court again sentenced Leavitt to death, and this time the state supreme court affirmed. *State* v. *Leavitt* (*Leavitt II*), 822 P.2d 523 (Idaho 1991).

After exhausting his direct appeals and state collateral review, Leavitt petitioned for a writ of habeas corpus claiming Parmenter was ineffective for failing to investigate his mental health. The district court granted Leavitt's request for the MRI that the state court had denied, and the experts found that it looked normal.

The district court dismissed Leavitt's claims as procedurally defaulted, but we reversed and remanded for the district court to consider Leavitt's ineffectiveness claims. *Leavitt III*, 383 F.3d at 814. On remand, the state moved for an additional MRI because the defense never disclosed the results of its earlier test. The new MRI showed white matter hyperintensities (WMHs) in Leavitt's brain, which could indicate an organic cause of his personality disorders. Based on this evidence, the district court concluded that Parmenter had been ineffective in

failing to investigate Leavitt's mental health before the second sentencing hearing, specifically in failing to renew the request that the court obtain an MRI. The district court granted a conditional writ of habeas and the state appeals.

## Analysis

We review de novo the district court's grant of his petition for writ of habeas corpus. *See Martinez-Villareal* v. *Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996). "To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies." *Silva* v. *Woodford*, 279 F.3d 825, 835 (9th Cir. 2002). Clear error review is "significantly deferential" and requires us to accept the district court's findings absent a "definite and firm conviction that a mistake has been committed." *Rhoades* v. *Henry*, 596 F.3d 1170, 1177 (9th Cir. 2010) (quoting *Silva*, 279 F.3d at 835) (internal quotation marks omitted). Because Leavitt filed his original habeas petition in the district court before the effective date of AEDPA, its provisions do not apply. *Alaca* v. *Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). To establish ineffective assistance of counsel, Leavitt must show both that his counsel's performance was objectively deficient and that it prejudiced his sentencing. *See Edwards* v. *Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (citing *Strickland* v. *Washington*, 466 U.S. 668, 687, 694 (1984)). We review the district court's determination as to both of these issues de novo. *United States* v. *Birtle*, 792 F.2d 846, 847 (9th Cir. 1986).

### 1. *Deficient Performance*

[1] Judicial scrutiny of counsel's performance is highly deferential. *Strickland* v. *Washington*, 466 U.S. 668, 690 (1984) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). A defense lawyer must make reasonable investigations that, at a mini-

mum, permit informed decisions about how best to represent his client. *Sanders* v. *Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Here, Parmenter made a thorough investigation in preparation for the sentencing hearing. He met with Leavitt just a few days after he was appointed. He discussed the case with prior counsel and reviewed all transcripts and records from the prior proceedings. He spoke with Leavitt's mother and father "many more than 25" times. He interviewed Leavitt's brothers and sister, and "had many conversations" with Leavitt's ex-wife. Parmenter also interviewed several prison guards to gather information about Leavitt's behavior while incarcerated. This case thus does not present the typical capital case ineffectiveness situation where counsel scrambled to prepare just before the penalty phase, or failed to investigate entire areas of mitigation. *See, e.g.*, *Hamilton* v. *Ayers*, 583 F.3d 1100 (9th Cir. 2009).

**[2]** Petitioner nonetheless argues Parmenter was ineffective for failing to gather additional mental health evidence for the second sentencing hearing. We reject this argument because the decision to forego further investigation into Leavitt's mental health condition was reasonable in light of counsel's knowledge of what had transpired at, and in preparation for, the initial sentencing hearing.

**[3]** To begin with, Parmenter knew that Kohler and Hart had already spent significant time investigating mental health evidence during the course of their representation. All of Leavitt's prior mental health records, two from licensed psychologists and one from a psychiatrist, diagnosed him with a personality disorder, without suggesting any possibility of an organic brain injury. Dr. Groberg, a psychologist retained specifically to gather mitigation evidence, also diagnosed Leavitt with a personality disorder. Original counsel requested a sec-

ond expert, Dr. Jaynes, to conduct more testing. Leavitt's EEG came back completely normal, but the CT scan revealed a "very slight" cortical atrophy that suggested a "possibility" of disease. But even Dr. Jaynes, who identified this abnormality, concluded that there was no "objective neurological deficit on examination" nor any "evidence of higher cerebral dysfunction."

**[4]** "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable determination that particular investigations are unnecessary." *Babbit* v. *Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998); *see also Cullen* v. *Pinholster*, 131 S. Ct. 1388, 1406-07 (2011). Parmenter's review of prior counsel's efforts provided an informed basis for him to decide not to investigate further. The dissent dismisses this conclusion as "appellate factfinding." Dissent at 6493. But our job is not to divine Parmenter's actual reasons for failing to seek additional testing, but rather to "affirmatively entertain the range of possible 'reasons [Leavitt's] counsel *may* have had for proceeding as [he] did.' " *Pinholster*, 131 S. Ct. at 1407 (emphasis added).

**[5]** Leavitt argues that Parmenter could not have made a reasonable strategic decision to forgo further investigation because Dr. Jaynes's findings constituted a promising lead that required follow up. Our recent decision in *West* v. *Ryan*, 608 F.3d 477 (9th Cir. 2010), suggests otherwise. In *West*, we held that counsel was not deficient for failing to unearth additional mental health evidence where the doctor's report contained purported "red flags." *Id.* at 488-89. These flags included slow movement of his right hand, which could reflect neurological deficits. *Id.* at 489. Based on this finding, the doctor commented that he could not "rule[ ] out" a cognitive impairment absent further testing. *Id.* We held that this did not create a duty to investigate further because earlier tests revealed that the defendant's "intellectual memory, language and perceptual functioning" were normal. *Id.* at 488. The doctor ultimately concluded that "the results . . . [of the evalua-

tion were] more consistent with an individual of low educational status . . . than with any cognitive impairment." *Id.* (alteration in original) (internal quotation marks omitted).

**[6]** Similarly, Leavitt's doctor may have found some evidence suggesting a cognitive impairment, but he ultimately concluded that the results—including his performance on personality, psychological and cognitive tests—were more consistent with a diagnosis of a personality disorder. As in *West*, we conclude that "such an equivocal finding . . . is not the kind of 'powerful mitigating evidence' sufficient to overcome *Strickland*'s presumption that counsel acted reasonably in declining to investigate further the possibility that [the defendant] might suffer from a cognitive impairment." *Id.* (citing *Bobby* v. *Van Hook*, 130 S. Ct. 13, 19 (2009)).

**[7]** Second, even had Parmenter wanted to investigate further, he had good reason to believe a motion for another court-appointed doctor would be denied. Leavitt was *not* constitutionally entitled to a third court-appointed psychiatric expert under *Ake* v. *Oklahoma*, 470 U.S. 68 (1985). *Contra* dissent at 6497-98. Leavitt himself has never tried to argue otherwise, and with good reason: By its own terms, *Ake* "limit[ed] the right [it] recognize[d]" to "provision of *one* competent psychiatrist." *Ake*, 470 U.S. at 79 (emphasis added). Given this unambiguous language, we've held that the defendant "lacks the right to appointment of a *second* psychiatrist," *Pawlyk* v. *Wood*, 248 F.3d 815, 824 (9th Cir. 2001), even where the first psychiatrist is alleged to be incompetent or reaches a diagnosis unfavorable to the defense, *see Harris* v. *Vasquez*, 949 F.2d 1497, 1516-17 (9th Cir. 1990). We've recognized that *Ake*'s "limitation to a single, independent psychiatrist is critical given that '[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently . . . on the appropriate diagnosis.' " *Pawlyk*, 248 F.3d at 823 (quoting *Ake*, 470 U.S. at 80) (alteration and first omission in original). Accordingly, neither we, nor the Supreme Court, has ever held that a trial court violated *Ake* by refusing to

appoint a second, let alone third, mental health expert. *E.g.*, *Harris*, 949 F.2d at 1516 (*Ake* did not require appointment of a third psychiatrist); *see also, e.g.*, *Granviel* v. *Lynaugh*, 881 F.2d 185, 191 (5th Cir. 1989) (*Ake* did not require appointment of an additional psychiatrist); *Martin* v. *Wainwright*, 770 F.2d 918, 934 (11th Cir. 1985) (*Ake* did not require appointment of a second neurologist). Leavitt had not one, but two court-appointed experts, and so was not entitled to an additional evaluation.

**[8]** Sensing the walls of precedent closing in on its conclusion, the dissent resorts to arguing that Leavitt was denied his right to "a competent psychiatrist who will conduct an *appropriate examination*." Dissent at 6497. First, it's far from clear that such a right exists, *see Vickers* v. *Stewart*, 144 F.3d 613, 615 (9th Cir. 1998), or that, if it does, we'd be able to review it on habeas, *see Wilson* v. *Greene*, 155 F.3d 396, 400-01 (4th Cir. 1998) (refusing to recognize an *Ake* claim "solely based on whether [the first mental health expert] conducted an 'appropriate' examination"); *cf. Harris*, 949 F.2d at 1516-17 (refusing to recognize an *Ake* claim based on the argument that the first expert was incompetent). Second, there's no indication that the examinations in this case were in any way inappropriate. The doctors reviewed Leavitt's files, conducted a battery of psychological tests and administered both an EEG and a CT scan to detect neurological abnormalities. Due process does not require a state to fund every technologically conceivable test to rule out the possibility of an organic mental disorder. Third, even putting aside the issue of adequacy, Leavitt wasn't entitled to additional testing because he couldn't have "made a preliminary showing that his [mental health was] likely to be a significant factor" in his sentencing in light of the judge's express indication to the contrary. *Ake*, 470 U.S. at 74; *see also Williams* v. *Stewart*, 441 F.3d 1030, 1048 (9th Cir. 2006) (upholding trial court's denial of an expert under *Ake* because the defendant "failed to establish that his sanity was likely to be a significant factor in his defense"). *Ake* did not give Leavitt the right to another expert;

had the state trial court granted him one, it would have been a matter of judicial grace, not constitutional right.

**[9]** Given that Leavitt was not entitled to a third expert, the judge's previous hostility towards appointing another doctor became all the more relevant in Parmenter's development of a mitigation strategy. Parmenter knew about prior counsel's failed attempt to obtain an MRI. Not only did the judge deny Kohler and Hart's request, he had an order ready and waiting before they had even presented it. The order stated that "any further evidence of the mental condition of the defendant . . . will not be a significant factor in the sentencing . . . [and so the MRI] shall not be ordered." Given the judge's emphatic statement that mental health evidence would not be significant, it was perfectly reasonable for Parmenter to believe that he "might pretty routinely deny" a second request for an MRI. Counsel need not file motions that are likely to lose, because doing so may cost the defendant "some of his lawyer's credibility with the judge." *Lowry* v. *Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).

**[10]** Preserving credibility was particularly important because the judge was not just presiding over the hearing, but deciding the ultimate issue of whether to impose the death penalty. Parmenter recognized that, in general, filing frivolous motions "may have some effect on [the judge's] fact finding." In this situation, it would have been reasonable for him to fear that renewing the motion would irritate the judge and hurt his client's case. We review counsel's decision solely to determine whether it fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A decision to avoid annoying the judge—at least when it comes at the small price of forgoing the filing of a motion that was once denied and will likely be denied again—falls well within *Strickland*'s range of reasonableness.

**[11]** Leavitt's direct request to the sentencing judge for more psychological testing did not obligate Parmenter to

renew the motion. "The decisions on . . . what trial motions should be made, and all other strategic and tactical decisions[, is within] the *exclusive province* of the lawyer . . . ." ABA Standards for Criminal Justice 4-5.2 (2d ed. 1980) (emphasis added). In fact, because the judge indicated that he "was going to consider" Leavitt's request, Parmenter could reasonably have believed it was unnecessary to submit a motion. Even with the benefit of hindsight, Parmenter testified that he wasn't sure what new information he could have added to the original motion to convince the trial judge to change his mind. Parmenter reviewed all of Leavitt's medical records and the judge's denial of the original motion, and exercised his independent judgment that "it wouldn't do much good to take another run at Judge George [for] additional testing." Leavitt's disagreement with counsel's decision did not render it unreasonable.

**[12]** Third, Parmenter's decision to steer clear of the mental health issue was reasonable because the judge had already decided the mental health evidence was an aggravating factor. The judge stated that the personality disorder diagnosis was "not a mitigating factor, but rather a condemning factor [because i]t is the catalyst to provoke another possible homicide or serious physical injury." Parmenter "didn't want Judge George to have additional ammunition" and acknowledged that this concern "may have been part of the reason that . . . Mr. Leavitt and I decided not to pursue that angle." His concern was reasonable because "in some cases, presenting evidence of . . . mental disorders to create empathy . . . might actually cause . . . worry and concern that the defendant is an 'irreparable monster.' " *Edwards* v. *Ayers*, 542 F.3d 759, 776 (9th Cir. 2008) (quoting John M. Fabian, *Death Penalty Mitigation and the Role of the Forensic Psychologist*, 27 Law & Psychol. Rev. 73, 90 (2003)). The trial judge had considered Leavitt's mental health aggravating at the first sentencing, and it was thus reasonable for Parmenter to fear that he would treat it as aggravating again.

Instead of continuing with a mitigation strategy Parmenter knew had been rejected by the trial judge, he reasonably decided to switch gears. Parmenter's goal was to humanize Leavitt by portraying him as something other than the monster the prosecution made him out to be. Parmenter wanted to develop a theme "that Rick Leavitt is a pretty good guy and not the kind of guy that should be put to death." Evidence of mental health may have detracted from, or even conflicted with, this strategy. *See Cox* v. *Ayers*, 613 F.3d 883, 897 (9th Cir. 2010). Parmenter acknowledged that raising a mental condition at mitigation "might [have] be[en] somewhat inconsistent with Mr. Leavitt's defense at trial. In *Cox*, we held that "counsel reasonably decided not to present, and not to look further for, evidence concerning Petitioner's character and emotional state [where t]hat decision reflected counsel's strategic choice to emphasize their primary argument at the penalty phase." *Id.* Parmenter likewise made a conscious and informed decision to focus the mitigation case on portraying the defendant as a "good guy," rather than try to excuse the crime by presenting evidence that he might have had mental health problems.

Counsel is not required to undertake *all* possible investigations. *See Strickland*, 466 U.S. at 690. There will always be more documents that could be reviewed, more family members that could be interviewed and more psychiatric examinations that could be performed. But, as the Supreme Court recently reminded us, "[t]here comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.' " *Pinholster*, 131 S. Ct. at 1407 (quoting *Strickland*, 466 U.S. at 691) (alteration in original); *see also Bobby* v. *Van Hook*, 130 S. Ct. 13, 19 (2009) (per curiam) (holding that at some point, additional evidence would be only cumulative "and the search for it distractive from more important duties"). Parmenter had developed a knowledgeable foundation—from reading expert trial testimony, reviewing and marking up

medical reports and meeting with Leavitt—on which to base his decision to take the mitigation case in a different direction.

While Parmenter's chosen strategy failed, we must avoid the temptation to evaluate his decision through the "fabled twenty-twenty vision of hindsight." *Brown* v. *Uttecht*, 530 F.3d 1031, 1035 (9th Cir. 2008) (internal quotation marks omitted). We must evaluate his performance only based on whether he made reasonable, informed decisions based on what he knew at the time.

**[13]** So what *did* Parmenter know once he took over the second sentencing? He knew that Leavitt had been examined by at least five mental health professionals, all of whom diagnosed him with personality disorders. He knew that the trial judge had summarily denied a request for more testing. And he knew that the judge who would ultimately decide whether to impose the death penalty didn't consider such evidence to be mitigating. Having seen former counsel try and fail with a mental impairment mitigation strategy, it was not unreasonable for counsel to try a different tack. Such strategic decisions are precisely of the kind we vest in the discretion of informed, experienced trial counsel.

2. *Prejudice*

**[14]** Even if we assume that Parmenter's performance was deficient, Leavitt suffered no prejudice. Petitioner has the burden of showing a reasonable possibility that, but for counsel's deficient performance, the death sentence would not have been imposed. *Wong* v. *Belmontes*, 130 S. Ct. 383, 386 (2009). Where the defendant claims ineffective assistance for failure to file a particular motion, he must "not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome." *Styers* v. *Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008). Because it is unlikely that Judge George would have granted the motion for

additional testing, or that the results of any such testing would have changed the outcome of the sentencing, we cannot say the alleged deficiency was prejudicial.

Leavitt has not established a reasonable *probability* that the motion would have been granted had Parmenter presented it. Although Parmenter believed that Judge George might be "a little more wishy-washy than other judges," he also testified that the judge had "already made himself clear in the first sentencing hearing" and was therefore likely to deny the request. Parmenter might have supported a renewed motion with evidence of Leavitt's behavior while imprisoned over the four years, but as the prison officers testified, Leavitt was a model prisoner who had no incidents of explosive behavior. This undermined the theory that he had an organic brain disorder that rendered him uncontrollably violent from time to time.

It would certainly not have been an abuse of discretion for the judge to deny the motion. *See United States* v. *George*, 85 F.3d 1433, 1437-38 (9th Cir. 1996). As discussed above, the defendant had no right to an additional expert under *Ake*. *See* pp. 6477-79 *supra*. Moreover, although the Idaho Supreme Court vacated the original sentence, it did not do so on the ground that there should have been more mental health testing. To the contrary, the court "[did] not disagree with the findings of the trial court that the defendant herein is possessed of an 'intermittent explosive disorder' " or that the mental health evidence should be considered aggravating. *Leavitt I*, 775 P.2d at 608. It disagreed only with the "trial court's misperception of the alternatives available to him" and authorized him, "*in [his] discretion*, . . . [to] obtain additional information and/or testimony." *Id.* (emphasis added). Having already appointed two experts, Judge George's exercise of that discretion to deny the motion would have been appeal-proof.

Most damaging to Leavitt's prejudice claim, however, is the fact that Judge George actually considered his request for

additional testing but did not grant it. At the beginning of the second sentencing hearing, Leavitt told the judge that he "would like to have . . . a[nother] psychological evaluation done on [him]." Judge George could have denied the request as untimely or required Parmenter to submit a motion as Leavitt's counsel, but instead he said he would "consider what might need to be done." At the close of the hearing, Judge George again indicated his intent to consider Leavitt's request: "Mr. Leavitt in the beginning indicated that the court might consider . . . some further psychological report. I'm not passing judgment on that right now. I'm certainly going to consider that." A little over a month later, the court sentenced Leavitt to death. There is no reason to believe the judge didn't take Leavitt's request into consideration, as he promised he would. If the judge considered it, but did not grant it, Parmenter's failure to file a formal motion to the same effect cannot have been prejudicial.

Even if the motion had been granted, Leavitt must show that technology was sufficiently advanced in 1989 to enable a doctor to detect the abnormalities. The district court acknowledged that the abnormalities in the 1996 MRI were overlooked by Leavitt's doctor, and were not discovered until 2006, but ultimately credited his neurological expert who testified that a reasonable medical examiner would have been able to spot the abnormalities on an MRI in 1989. Because the district court's resolution of the factual dispute was not clearly erroneous, we proceed on the assumption that the abnormalities would have been detected at that time had an MRI been performed. *See Bonin* v. *Calderon*, 59 F.3d 815, 823 (9th Cir. 1995).

Starting with that assumption, "we [must] reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins* v. *Smith*, 539 U.S. 510, 534 (2003). Thus, we must examine what these abnormalities were and how they would have impacted the mitigation case. White Matter Hyperintensities, like those on Leavitt's brain scan, are

"simply bright spots that appear on an MRI." But the WMHs, previously called UBOs, or "unidentified bred [sic] objects," just don't tell us very much. In trying to explain what the bright spots might mean, Dr. Bigler testified that WMHs represent a disruption in the normal flow of electrical impulses, which "can" affect behavioral regulation and "may" slow down brain responses. Dr. Beaver testified that he would "hypothesize" that the WMHs were an underlying cause of Leavitt's personality disorders. Such opinions, which couch results in tentative language, are simply not enough to show prejudice. *Rhoades*, 596 F.3d at 1193 (finding no prejudice where expert reports "talk in terms of conditions that [the defendant] 'likely' has or 'may' have"); *cf. Sears* v. *Upton*, 130 S.Ct. 3259, 3263 (2010) (finding prejudice where "the expert's opinion [of brain pathology] was unequivocal").

The experts' testimony was not only tentative, but also highly speculative. Dr. Bigler opined that the location of the WMHs "seems to have a bearing" on the type of problem manifested. Dr. Beaver then testified that because the bright spots are located in an area associated with emotion and behavior, they might have caused Leavitt's violent outbursts. But Dr. Martell testified, and the district court accepted, that brain injury *anywhere* in the brain could lead to violent behavior. And, although Dr. Bigler testified that WMHs are more likely to be present in people with psychological disorders, he conceded that they are also seen in the MRIs of some perfectly healthy people. This kind of speculative mitigation evidence is not entitled to significant weight. *See Bible* v. *Ryan*, 571 F.3d 860, 871 (9th Cir. 2009) (finding no prejudice because argument that "brain dysfunction . . . can be an explanation for violent behavior" was speculative).

Moreover, there's a significant possibility that, had this highly speculative evidence been given any weight at all, it would have been treated as aggravating rather than mitigating. *See Atkins* v. *Virginia*, 536 U.S. 304, 321 (2002). In *Cullen* v. *Pinholster*, 131 S. Ct. 1388 (2011), for example, the

Supreme Court found that new evidence of an "organic personality syndrome" and "brain damage" was "by no means clearly mitigating, as the jury might have concluded that [the defendant] was simply beyond rehabilitation." *Id.* at 1396-97, 1410. The Court concluded that, in light of the ambiguous nature of the brain injury, "[t]here [wa]s no reasonable probability that the additional evidence . . . would have changed the jury's verdict." *Id.* at 1409. Here, too, there's no way of knowing which way evidence of a biological mental impairment would have cut; it very well may have counted against Leavitt.

Even assuming the evidence of WMHs would have been treated as mitigating, we must discount its weight because any evidence of a brain dysfunction causing uncontrolled, sudden, violent impulses would not explain the most disturbing aspect of the murder here—the surgical mutilation of the victim's body. *Cf. Belmontes*, 130 S. Ct. at 389. We agree with the district court that "Leavitt's removal of Ms. Elg's sexual organs is more strongly associated with simple depravity than a continuation of rage or anger." Even had the trial judge been convinced by Leavitt's experts that the repeated, violent stabbing of the victim could be explained by some abnormalities in his brain, the sexual mutilation, for which no expert testimony was available, pointed to a different cause altogether. *See Mickey* v. *Ayers*, 606 F.3d 1223, 1248 (9th Cir. 2010) (finding no prejudice in counsel's failure to adequately prepare mental health expert whose testimony "suffered from [the] fundamental weakness . . . that a jury was unlikely to believe that a defendant suffering as [the expert] diagnosed could act as the facts of the crime showed [the defendant] did"); *Pizzuto* v. *Arave*, 280 F.3d 949, 962 (9th Cir. 2002) (finding no prejudice in counsel's failure to request neurological testing because "a[n organic brain] disorder could not account for, or have any bearing upon, the Herndon murders which the evidence demonstrates were premeditated, planned out, and part of a consecutive series of complex acts").

**[15]** The evidence is less weighty still because it is merely adds to what had already been presented. *See Bible*, 571 F.3d at 871-72. The trial judge knew that Leavitt had a slight atrophy in his cerebral cortex. This was more than just a "lead," it was itself evidence of some physiological problem. True, it was not clear exactly what the brain atrophy meant—Dr. Jaynes had testified that it "may or may not" lead to cognitive impairment—but neither is it clear what the WMHs mean. The WMHs are thus additional, cumulative evidence of the brain disorder the sentencing judge already knew Leavitt had. For the prejudice analysis, cumulative evidence is given less weight because it is not as likely to have affected the outcome of the sentencing. *Babbitt*, 151 F.3d at 1175.

**[16]** We must look at the effect of the omitted evidence in light of all the mitigation evidence presented. *Wiggins*, 539 U.S. at 534. The sentencing judge was aware of all the evidence, including mental health evidence, that was given at the first trial. The court already treated evidence of Leavitt's intermittent explosive disorder as mitigating. To this, Parmenter added the testimony of several witnesses from Leavitt's past, including family members who spoke very highly of him. Parmenter also presented the testimony of several prison guards, who testified that Leavitt had been a model prisoner in the intervening years, that he thrived in the structured prison environment and that he did not pose a threat of harm to other prisoners. Parmenter additionally introduced evidence that Leavitt was an accomplished artist and poet and had won awards for his talent. The sentencing judge also considered mitigating evidence that Leavitt was married, had reestablished contact with his son, had been steadily employed and had no prior felony convictions. The addition of an ambiguous result from Leavitt's third mental health evaluation is not enough to raise a reasonable possibility that the outcome would have been different.

**[17]** Given the exceptional depravity of this murder, it is unlikely that additional evidence of a brain abnormality would

have made a difference. *See, e.g.*, *Woodford* v. *Visciotti*, 537 U.S. 19, 25-26 (2002) (per curiam); *Campbell* v. *Kincheloe*, 829 F.2d 1453, 1464 (9th Cir. 1987) ("[G]iven the overwhelming aggravat[ing] factors and the heinous nature of the crime there is no reasonable likelihood that the jury's verdict would have been different had mitigating evidence been introduced."). The Supreme Court's recent decision in *Wong* v. *Belmontes*, 130 S. Ct. 383 (2009), is instructive. Belmontes was sentenced to death after bludgeoning his victim to death with a steel dumbbell during the course of a robbery. *Id.* at 384. The Supreme Court held that excluded evidence of "impairment of the neurophysiological mechanisms for planning and reasoning" was not prejudicial because it was "hard to imagine expert testimony . . . outweighing the [gruesome] facts of [the] murder." *Id.* at 389, 391. Belmontes's crime was gruesome, to be sure, but it pales in comparison to Leavitt's murder of Danette Elg:

> Leavitt's repeated and pitiless stabbing and cutting of his victim in all parts of her body, including even a thrust through her eye and into her brain, was vicious and remarkable enough for the most jaded reviewer of this genre of crimes. The added organ-removing mutilation of the victim "as part of the death dealing attack or as a grisly aftermath" is yet another marker of the unnecessary tortuousness of this crime.

*Leavitt*, 383 F.3d at 837 (quoting *Leavitt*, 822 P.2d at 526). The details of this crime are simply too atrocious for the exclusion of tentative, cumulative evidence to undermine confidence in the sentence.

The dissent would have us believe that an MRI would have revealed critical new mitigating evidence sufficient to shake our confidence in the judge's imposition of a capital sentence. Dissent at 6501-05. But this is simply not so. The state trial judge—who made the ultimate life or death decision—

described the mitigating evidence as "feathers on the scale" when weighed against the heinousness and brutality of Leavitt's crime. Reweighing all the evidence presented at the second sentencing hearing, the additional feather provided by the MRI evidence would not have been nearly enough to tip the scale in Leavitt's favor, so there was no prejudicial error.

* * *

[18] One definition of insanity is repeating the same course of action twice and expecting a different result. Parmenter's decision to cease further investigation into Leavitt's already heavily analyzed mental health was entirely rational. Leavitt has not made out his claim that Parmenter's assistance was constitutionally deficient. Even if he had, the gruesome nature of the crime, coupled with the relatively weak additional evidence that might have been revealed had an MRI been granted, leads us to conclude that any ineffectiveness was not prejudicial.

**REVERSED.**

REINHARDT, Circuit Judge, dissenting:

The circumstances of Richard Leavitt's murder of Danette Elg are indeed horrendous. That alone should have been a signal that there was something radically wrong with Leavitt, who was otherwise a law-abiding citizen, a father and a husband. I agree with the trial judge who sentenced Leavitt to death that "the fact that" such a person "would do this act leaves one[ ] asking why." Leavitt's counsel, David Parmenter, failed to provide an answer to that question that could have saved his client's life: Leavitt suffered from an organic brain disorder in the part of the brain responsible for regulating emotion and impulse control. Despite the majority's many tangents and alternative holdings, Leavitt's habeas petition

concerns one simple point: whether counsel should have made a motion for the MRI examination of his brain that the court-appointed neurologist had recommended. Had Parmenter done so, the examination would have revealed Leavitt's organic neurological disorder — powerful mitigating evidence that could well have altered the sentencing decision of the trial court. That alone is sufficient to resolve this case. Parmenter's failure, despite the neurologist's recommendation, to seek the examination that was necessary to establish the existence of Leavitt's organic brain disorder unquestionably rendered his performance deficient; and that inexplicable conduct prejudiced his client under any reasonable standard. Not surprisingly, the United States District Court for the District of Idaho so found, and we are asked simply to affirm the lower court.

Parmenter, who represented Leavitt at his resentencing, knew the following at the time of that hearing: (1) Prior to Leavitt's original sentencing, his court-appointed neurologist had recommended further examination, specifically an MRI, to determine if Leavitt had "organic or physiological disfunction [sic] of the brain" after a CT scan revealed abnormalities in his brain's white matter. (2) Leavitt's original trial counsel had then attempted to obtain an MRI before Leavitt was sentenced, but the trial court had denied counsel's motion for a continuance to do so. (3) The trial court had erroneously considered Leavitt's diagnosis — for personality disorders, rather than an organic brain disorder — to be an aggravating, rather than a mitigating, factor, in pronouncing Leavitt's first death sentence. (4) The Idaho Supreme Court had subsequently vacated Leavitt's death sentence on appeal, because the trial court record failed to show (a) "an adequate weighing of mitigating circumstances against the aggravating factors" and (b) a "demonstrat[ion] that the trial court adequately considered long-term penal confinement as an adequate protection of society, as contrasted with the imposition of the death penalty." *State v. Leavitt*, 775 P.2d 599, 601 (Idaho 1989). (5) When the case was on remand, both Leavitt and his mother

had requested a new "presentence investigation" and asked Parmenter to further develop the neurological evidence. (6) During the resentencing hearing, the trial court expressed its "desire to give the defendant all of his rights." (7) One of those rights included "access to a competent psychiatrist who will conduct an *appropriate examination* and assist in evaluation, preparation, and presentation of the defense," as to which Leavitt's mental condition had been shown to be a significant factor. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (emphasis added). And (8) in general, as capital defense counsel he was obligated to investigate and present evidence of mental impairment, in light of the mitigating force of such evidence. *See, e.g.*, *Evans v. Lewis*, 855 F.2d 631, 636-637 (9th Cir. 1988).

Any reasonable attorney under these circumstances would have renewed the motion for the MRI scan that Leavitt was wrongly denied prior to his original sentencing — a scan that we now know would have revealed white matter hyperintensities in the right frontal lobe of his brain, which are organic neurological irregularities in an area believed to be responsible for regulating emotion and impulse control. Because evidence of such an organic disorder is the kind of mitigating evidence by which a defendant's "moral culpability would have been reduced," a reasonable attorney might well have saved his client from the death penalty by obtaining that evidence and presenting it to the court. *Caro v. Ryan*, 280 F.3d 1247, 1257-1258 (9th Cir. 2002). Nevertheless, Parmenter totally neglected to do so upon resentencing, even though the Idaho Supreme Court had already expressed concern over Leavitt's mitigation profile — a failure that Parmenter himself has since admitted "[i]n retrospect" was "probably" unjustified.

In light of the clear evidence of Parmenter's deficient performance regarding the most important aspect of the penalty phase of Leavitt's trial, and Leavitt's inexplicable behavior surrounding the commission of the murder, there is, at the

least, a "reasonable probability" that, had Parmenter sought
and obtained the test that would have shown Leavitt's organic
brain disease, a reasonable trial court would have sentenced
Leavitt to life without parole, or alternatively that the new
death sentence, like the first, would have been reversed on
appeal or vacated on habeas corpus. *Strickland v. Washington*,
466 U.S. 668, 694 (1984). Leavitt was therefore prejudiced by
Parmenter's ineffective assistance. Accordingly, I would
affirm the judgment of the Chief Judge of the United States
District Court for the District of Idaho, including his condi-
tional grant of the writ.

## I.   Deficient Performance

Parmenter chose not to move for an MRI examination dur-
ing the resentencing proceedings — notwithstanding his cli-
ent's own request that he do so — for the simple reason that
he thought the trial court would deny the motion again. As he
acknowledged at the evidentiary hearing in these habeas pro-
ceedings, however, "there was really no reason not to at least
ask the judge to grant" a renewed motion, especially in light
of the failure of counsel at the first hearing to advise the judge
of the controlling Supreme Court decision, *Ake*. Parmenter's
fear that the motion might be denied again did not justify his
failure to attempt to obtain the critical evidence that would
allow him to make the strongest argument possible in his cli-
ent's favor.

The majority's view — that it was "perfectly reasonable"
for Parmenter to refrain from renewing the MRI request
because moving for further neurological investigation could
have "irritate[d] the judge and hurt his client's case," maj. op.
at 6497 — cannot be taken seriously, for it "rests on the
apparent belief that our Nation's trial judges . . . are unwilling
to accept zealous advocacy and that, once antagonized by it,
will punish such advocates with adverse rulings." *Melendez-
Diaz v. Massachusetts*, 129 S. Ct. 2527, 2555 (2009) (Breyer,
J., dissenting) (internal quotation marks and alteration omit-

ted). To the contrary, "in death cases" judges generally expect that, given the stakes, "[i]t's the battle of the zealots." Alex Kozinski, *Tinkering with Death — A death-penalty judge reflects: How does it feel to send another man to die?*, The New Yorker (Feb. 10, 1997), at 50. Even worse is the idea that the judge whose actions we review would order the execution of a capital defendant because he became irritated by the lawyer's renewal of a motion. "[S]igning the order that will lead to the death of another human being" is the gravest duty a judge has, capable of "filling [him] with a nagging sense of unease, something like motion sickness." Kozinski, *Tinkering with Death*, at 48, 52. In this circumstance, no reasonable person could believe that annoyance at a lawyer's motion would lead a judge to reach that result.

Indeed, any fear Parmenter may have had of an adverse ruling was unreasonable in light of the weight of authority that would have supported his motion, including a critical Supreme Court decision that original counsel had not brought to the trial court's attention during Leavitt's first sentencing proceedings. Under *Ake*, when a mental health professional has made a plausible showing that testing, such as an MRI, constitutes part of an "appropriate examination," that testing is one of the "raw materials integral to the building of an effective defense" that the State must provide to the defendant. *Id.* at 77. No reasonable counsel, knowing that controlling authority on a critical issue had not been presented the first time, would have declined to even *attempt* to renew the motion.

The majority nonetheless offers a number of other theories as to why Parmenter's failure to request an MRI examination was a reasonable strategic decision. First, the majority suggests that Parmenter deliberately decided not to revisit the organic neurological issue in light of the inconclusive neurological findings prior to Leavitt's original sentence. Maj. op. at 6475-76. That bit of appellate factfinding must come as news to Parmenter, who testified, as set forth above, that he

had not renewed the motion for further neurological examination because the trial court had previously denied that motion during the first sentencing proceedings — not that *he* believed the neurological case to be weak. In any event, there is no way Parmenter could have actually *decided* whether a mitigation strategy based on Leavitt's organic brain disorder was the superior one without first investigating whether Leavitt in fact had such a disorder.[1]

Second, the majority suggests that Leavitt's counsel made a reasonable choice not to move for an MRI because the trial court had previously considered "the mental health issue" to be an aggravating factor rather than a mitigating factor. Maj. op. at 6480. But the majority's sleight of hand should not mislead anyone; characterizing an MRI examination as merely additional "mental health evidence" blurs an important distinction. The manner in which the trial court had previously considered Leavitt's then-diagnosed *personality* disorder would have told Parmenter nothing about how the court would have viewed the *neurological* disorder that the MRI would have revealed. Evidence of "organic brain dysfunction could have provided significant mitigating evidence," *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (en banc). Defense counsel accordingly had a "duty to investigate and present mitigating evidence of mental impairment." *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998).

---

[1]*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), does not bear on our analysis. That case, unlike this one, was governed by AEDPA and its "doubly deferential" standard of reviewing counsel's performance. *Id.* at 1403, 1410. Moreover, *Pinholster* did not modify the standard for deficient performance set forth in *Strickland*; it simply applied that standard under the "highly deferential" mode of analysis dictated by AEDPA. *Id.* at 1403-1408. *Pinholster* reaffirmed that, under *Strickland*, " 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Id.* at 1407 (quoting *Strickland*, 466 U.S. at 691) (alterations and emphasis omitted). Under this standard, Parmenter's decision was unreasonable.

Even in cases involving many aggravating factors, including the gruesomeness of the crime, counsel's failure to present evidence of an organic neurological condition at the sentencing phase is sufficiently prejudicial to establish ineffective assistance of counsel. *See Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003). Indeed, the Supreme Court has made clear that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citing *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Thus, it was entirely unreasonable to fear broaching "the mental health issue" again, even if Parmenter did think of organic neurological disorders and personality disorders as indistinct, particularly given that the trial judge was no doubt aware of the fact that the Idaho Supreme Court had already reversed his decision for failing to give sufficient consideration to mitigating factors.[2]

The majority is left with the argument that Parmenter "made a strategic decision to focus on convincing the judge that Leavitt was a 'good guy,' " and accordingly "made a thorough investigation in preparation for the sentencing hear-

---

[2]The majority's suggestion that in vacating Leavitt's first death sentence, the Idaho Supreme Court *approved* of the trial court's decision to consider evidence of Leavitt's personality disorders to be aggravating is totally unsupported by the state court's opinion. Maj. op. at 6483. The court first noted that it did not disagree with the trial court's factual finding that Leavitt had an "intermittent explosive disorder." *Leavitt*, 755 P.2d at 608. Then, the court observed that while "the defendant's personality and psychological makeup may make the possibility of 'rehabilitation and possible probation' non-existent," the absence of such a possibility did not excuse the court's failure to consider whether the mitigating evidence presented should have yielded a sentence of life imprisonment rather than death. *Id.* Unsurprisingly, when considering the same psychological evidence on remand, the trial court recategorized it as mitigating evidence.

ing" by reviewing the transcripts and records from prior pro-
ceedings, speaking with Leavitt's immediate family members,
and inquiring into Leavitt's behavior while incarcerated. Maj.
op. at 6473, 6475. Parmenter could not have "made a strategic
decision" as to which mitigation argument to make, however,
without knowing whether Leavitt had organic brain damage.
That he conducted a thorough investigation relevant to one
possible strategy does not make any more reasonable his fail-
ure to investigate a potentially much stronger case for mitiga-
tion. Parmenter simply neglected the one subject that he
should have known mattered most.

The majority is correct in one respect: "Good guys" simply
don't go around "hack[ing] out [a dying victim's] woman-
hood" or "playing with the female organs of a deer." Maj. op.
at 6472. It is far more likely that a person who engages in
such conduct has an organic mental disorder than it is that he
is simply a likeable fellow who had a bad day — or two.
Faced with Dr. Jaynes's testimony from the first sentencing
proceedings that cortical atrophy suggested a possibility of
organic neurological disease, and the reality that further test-
ing would be required to determine if Leavitt had "organic or
physiological disfunction [sic] of the brain," Parmenter sim-
ply lacked any excuse for not moving for the MRI examina-
tion to which Leavitt was constitutionally entitled.[3] *See*

---

[3]The majority cites *West v. Ryan*, 608 F.3d 477 (9th Cir. 2010), to argue
that Jaynes's report contained mere "red flags" that Parmenter could rea-
sonably have decided to ignore in favor of other mitigation strategies. Maj.
op. at 6476-77. The majority's reliance on *West* — another case governed
by the "deferential" AEDPA standard, unlike this one, *id.* at 486 — is mis-
placed. In *West*, an examining physician's report stated that it could not
"rule[ ] out" a cognitive impairment caused by head injuries or substance
abuse absent further testing, but there is no record that the physician affir-
matively recommend such testing, in light of his many other tests of the
defendant. *Id.* at 489. Dr. Jaynes did recommend further testing of Leavitt
"to determine whether he has an organic or physiological disfunction [sic]
of the brain" — a recommendation that counsel at Leavitt's first sentenc-
ing acted upon by requesting an MRI examination. Whether counsel may

*Summerlin*, 427 F.3d at 630 ("We have long recognized an attorney's duty to investigate and present mitigating evidence of mental impairment.") (internal quotation marks omitted). No reasonable, competent counsel would have conducted Leavitt's resentencing proceedings as Parmenter did. His performance was without question deficient.

## II. Prejudice

If Parmenter had submitted a motion for an MRI in 1989, there is at least a "reasonable probability" that an objective decision maker would have granted the motion. *Strickland*, 466 U.S. at 694. If, for some reason, the court had denied such a motion, there is a reasonable probability that this error would have been reversed on appeal — either by the state appellate court or during federal habeas proceedings — and the MRI would ultimately have been ordered. I can be confident that this is so because under governing Supreme Court authority that existed by that time, when an indigent "defendant demonstrates to the trial judge that his [mental condition] at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an *appropriate examination* and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83 (emphasis added).

Here, it seems, there was even more than a "reasonable probability" that the motion would *not* have been denied again: Parmenter testified that, in his experience, the particular trial judge who presided over Leavitt's case was more prone to change his decisions than other judges were, if

reasonably fail to follow up on every lead even hinted at in the record concerning *possibly* mitigating evidence like the vaguely defined "cognitive impairment" due to trauma or substance abuse, as in *West*, and whether counsel may reasonably reject the specific recommendation of a medical expert concerning categorically mitigating evidence such as an organic brain disorder, are two entirely different questions.

shown a good reason for doing so, and the *Ake* argument that had been overlooked the first time would certainly have been a good reason. Moreover, *any* objective sentencing judge who followed the applicable law would have allowed neurological testing to take place if competent counsel had timely filed a motion under *Ake* requesting an MRI. Then, had testing been ordered, an MRI undertaken in 1989 would have revealed Leavitt's brain injury, as the district court found and neither the State nor the majority dispute. There is a reasonable probability that the court would then have seriously considered the mitigating evidence of Leavitt's brain injury and sentenced him to life imprisonment rather than death.

The majority disagrees, contending that Leavitt was not prejudiced by Parmenter's ineffectiveness because, it assures us, there is no way the motion would have been granted had it been made. Apparently, the majority believes that the trial judge would have disregarded professional norms, Supreme Court precedent, and this court's precedent, and ruled erroneously on a motion to obtain further neurological testing. Even if, in actuality, the trial court had *not* been willing to apply controlling law, that would not be relevant to our inquiry; instead, for purposes of a prejudice analysis, Leavitt is entitled to the presumption of a reasonable, lawful, and "objective" adjudicator who will follow the law. *See Summerlin*, 427 F.3d at 643. "[A] defendant has no entitlement to the luck of a lawless decisionmaker," and neither does the State, so we cannot presume that the motion would have been denied notwithstanding controlling law to the contrary. *Strickland*, 466 U.S. at 695. Furthermore, even if the motion had been denied, or if the trial court failed to give significant weight to the result of the MRI examination, competent counsel would have appealed — and there is a reasonable probability that the state supreme court would then have reversed the sentencing judge (again) or vacated the sentence during state habeas proceedings. *See, e.g.*, *State v. Leavitt*, 775 P.2d 599, 608 (Idaho 1989) (reversing Leavitt's first death sentence for errors during sentencing proceedings). In short, there was no excuse for

Parmenter's failure to renew the motion for further neurological examination. That failure rendered his performance deficient, and that deficiency prejudiced Leavitt.

Alternatively, the majority finds "no reason to believe the judge didn't take Leavitt's [own oral] request [for another psychological evaluation] into consideration," and therefore concludes that a properly filed motion would similarly have been considered and denied. Maj. op. at 6484. But we have absolutely no evidence, and the district court made no factual finding, that the sentencing judge *did* consider the informal oral request made by the defendant, as he would have been required to consider a written motion prepared by counsel. Indeed, while the trial court ruled on counsel's motion during the first sentencing hearing in a written order, the court did not rule on Leavitt's oral request at all. Furthermore, had Parmenter submitted a motion for an MRI, it surely would have included citations to the applicable authorities, such as *Ake*, and therefore would have been far more persuasive than Leavitt's informal request, which did not mention either an MRI or the legal authority supporting his request. "That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the wide-spread belief that lawyers in criminal courts are necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). Leavitt's own oral request did not and could not render harmless his counsel's failure to move for an MRI examination, as the majority appears to believe.

The majority also holds that Leavitt was not prejudiced by Parmenter's conduct because Leavitt's white matter hyperintensities, which would have been discovered had an MRI been ordered, "just don't tell us very much." Maj. op. at 6485. It reaches that conclusion because the medical experts who testified at Leavitt's evidentiary hearing spoke in hedged terms about the causes and effects of these anomalies in the brain. My colleagues fail to appreciate that doctors, unlike litigators, do not speak with absolute certainty and confidence — partic-

ularly where, as here, they are describing the scientific findings in a field where research is ongoing and the scientific community's understanding of the brain's inner workings is constantly developing.[4] Moreover, the prejudice inquiry is not concerned with certainties; rather, we must consider simply whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," meaning "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is therefore sufficient that the MRI evidence would have revealed abnormalities that are significantly correlated with "neuropsychiatric disorders," because this evidence of organic brain damage is "sufficient to undermine confidence" that Leavitt would still have been sentenced to death had that evidence been presented.

Applying *Strickland*, we have set aside sentences on the basis of ineffective assistance of counsel without needing to speculate about what sentence *would* be imposed at the new sentencing hearing to follow. Rather, it has sufficed that our confidence in the sentence on review has been "undermined" because of counsel's deficient performance, even when the circumstances of the crime of conviction were particularly brutal. *See, e.g.*, *Lambright v. Schriro*, 490 F.3d 1103, 1121, 1126 (9th Cir. 2007); *Summerlin*, 427 F.3d at 643; *Stankewitz*

---

[4]Nor is the evidence of a brain disorder "speculative"; the MRIs Leavitt introduced into the record provide strong evidence of them. Maj. op. at 6485 (citing *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009)). *But see Bible*, 571 F.3d at 871 ("Bible does not contend that he actually suffers from organic brain damage and he submitted no evidence of that . . . . Bible's argument, as we see it, relies on speculation that he may have some type of organic brain dysfunction or disorder. . . . Bible does not demonstrate that the results of further testing would have found a brain disorder. In his petition to the PCR court, Bible submitted a brief affidavit from a psychologist who opined that a neurological examination could document the effects of brain damage, but did not express the opinion that Bible suffered from any effects from early illnesses. Bible has not shown that more tests would have discovered and disclosed mitigation evidence sufficient to establish prejudice.").

*v. Woodford*, 365 F.3d 706, 723 (9th Cir. 2004); *Douglas*, 316 F.3d at 1091; *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001). The majority should have adopted the same approach in this case.

Even if I were to attempt to predict the outcome of a hypothetical new sentencing hearing, as the majority does, I could not reach the same result with any confidence. Evidence of organic brain injury, of a kind that may physically compel behavior or prevent emotional regulation of certain conduct, is the kind of evidence that suggests a defendant's "moral culpability would have been reduced." *Caro*, 280 F.3d at 1257-1258. Under our case law, such evidence, if it is credible, is considered weightier than evidence of non-organic, purely psychiatric or personality disorders, such as intermittent explosive disorder, that involve "a lack of emotional control." *Id.* at 1258. Leavitt's organic brain injury is of a kind that typically *prevents* individuals from exercising control over their behavior. His injury is present in the area of the brain thought to be responsible for regulating emotions, impulse control, and conduct, and falls firmly within the category of disorders that a sentencing court should ordinarily weigh more significantly in mitigation than run-of-the-mill psychiatric problems or non-organic personality disorders.

When considering punishment, courts generally treat an individual's failure to control a personality disorder, or to suppress an anti-social or psychopathic personality, as more blameworthy than an individual's response to an organic brain disorder. Whether or not this difference in assessing blame is warranted in this case is not a matter for us to decide; the court's duty is to apply the law as it now exists.[5] This court's

---

[5]The criminal law's treatment of mental health issues evolves over time, for better or worse. The definition of insanity, for example, has changed from time to time. See, for example, the *Durham* test, as set forth in *Durham v. United States*, 214 F.2d 862 (D.C. Cir. 1954) ("an accused is not criminally responsible if his unlawful act was the product of mental dis-

case law is replete with examples of the considerable weight that should be accorded at sentencing to evidence of neurological or organic damage.

In *Caro*, for example, we held that there had been prejudice at sentencing resulting from counsel's failure to call an expert during the penalty phase of the trial to testify about a capital defendant's organic brain injury, even though the jury heard testimony regarding other psychological or emotional problems. We emphasized that particular weight should always be given by a trier of fact during sentencing to evidence of organic injury because of the effect of such evidence on a finding of moral culpability. *Id.* at 1257-1258. In *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), we similarly determined that the petitioner received ineffective assistance of counsel because counsel failed to investigate and present mitigation evidence that the petitioner suffered from "possible organic impairment" and test results revealed "some level of preexisting neurological deficit." *Id.* at 1086. We held that the petitioner suffered prejudice at the sentencing phase because such evidence "was precisely the type of evidence that we have found critical for a fact-finder to consider when deciding whether to impose a death sentence." *Id.* at 1090. I therefore believe that we cannot have confidence that if the sentencing judge had been presented with mitigating evidence pertaining to Leavitt's brain injury he would have imposed the death penalty nonetheless.

---

ease or defect"), as contrasted with the stricter and currently accepted test of an individual's ability to distinguish right from wrong. *See Clark v. Arizona*, 548 U.S. 735, 742 (2006). Still, one difference that may serve to make the distinction at issue here somewhat justified is that, as the district court found, victims of a physical brain disease are able to control their conduct in a structured environment, whereas individuals who suffer from intermittent explosive disorder are not, decreasing the likelihood that an individual with an organic injury will pose a risk to others while incarcerated.

That there may not be a direct causal connection between Leavitt's brain abnormalities and his criminal act does not affect this analysis. Although it is difficult to conceive of the "horrific" offense committed by Leavitt being committed by anyone with a normal mind — or, in legal-medical terms, anyone without an organic brain disorder — the Supreme Court has held that no such connection is necessary for the existence of mental disorders to serve as a mitigating factor during sentencing. *See, e.g.*, *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (holding that the sentencing factfinder should "consider and give effect to" *all* potentially mitigating circumstances at sentencing.).

Moreover, the very existence of neurological problems may serve as mitigation at sentencing by eliciting sympathy from the sentencer. *See Douglas*, 316 F.3d at 1090; *see also Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (holding that mental health evidence could be mitigating at the penalty phase "even though it is insufficient to establish a legal defense to conviction in the guilt phase"). The district court correctly held that evidence of an organic brain defect may humanize a defendant, "in a way that the labels of antisocial personality disorder and intermittent explosive disorder d[o] not." As the district court noted in its findings of fact and conclusions of law, the role that Leavitt's brain injury may have played in his commission of the murder is "still not entirely free from ambiguity and uncertainty," but despite this uncertainty, there is no doubt that "the complete picture" including Leavitt's organic brain disorder "presents a stronger and more sympathetic mitigation profile than the one that was before the sentencing factfinder."

Evidence of serious mental problems — even such problems that are not organic in nature — may be sufficiently mitigating to warrant the imposition of a life sentence, rather than the death penalty, even in cases in which individuals have been convicted of truly horrific crimes. For that reason, our court and the Supreme Court have held that assistance of

counsel was ineffective when potentially mitigating evidence of a defendant's mental condition was not presented. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 391 (2005); *Williams v. Taylor*, 529 U.S. 362, 398 (2000); *Lambright*, 490 F.3d at 1125; *Stankewitz*, 365 F.3d at 723. Thus, we cannot assume that the grievous nature of the offense renders the failure to present evidence of the organic nature of a brain disorder non-prejudicial. The potential mitigating effect of Leavitt's neurological impairment was all the more likely given that the "factfinder" at the penalty phase of Leavitt's trial was a judge, who we must presume to have been well-versed in the case law and modern notions of criminal culpability, rather than a "jury[,] [which] might have concluded that [Leavitt] was simply beyond rehabilitation." *Pinholster*, 131 S. Ct. at 1410; *contra* maj. op. at 6485-86. Parmetner's failure to present evidence of such problems prejudiced Leavitt's defense. To put it differently, the failure should be sufficient to undermine our confidence in the verdict.

The majority's effort to downplay the evidence of organic brain damage as "cumulative" mitigation evidence is simply incorrect. "We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010). In this case, some mitigation evidence was presented on an unrelated topic, but none of that evidence approached what an MRI scan would have revealed in its ability to portray Leavitt as mentally disabled, rather than mentally disturbed. The MRI evidence would be far more than an "additional feather" on the scale of mitigating and aggravating evidence. *Contra* Maj. op. at 6489. Nor is *Wong v. Belmontes*, 130 S. Ct. 383 (2009) (per curiam), "instructive" on this point. In *Belmontes*, counsel failed to present evidence pertaining to the defendant's upbringing and character that was, according to the Court, substantially similar in type to evidence that counsel did present regarding the defendant's family life. Evidence of Leavitt's organic brain

disorder, by contrast, is entirely unlike the evidence of emotional or other mental problems introduced in this case — evidence that may in fact reflect a mistaken diagnosis — given the greater power of the former class of evidence to reduce moral culpability. *See Caro*, 280 F.3d at 1257-1258.

Finally, it should be obvious to anyone that the more horrendous the crime, the more likely it is that the perpetrator is suffering from some form of mental disorder. When that disorder is organic, it becomes more understandable to society why a human being would commit such an horrendous act.[6] Under our legal system, a brain disorder, no matter how serious, does not provide a defense unless it results in an inability to distinguish right from wrong. (Here, there is no question of legal insanity.) The law does, however, require that the sentencer be presented with all available information regarding an organic brain ailment and that such information be fully weighed in the balance before a decision is made to terminate the life of the person suffering from that disease. The most compelling mitigation evidence in the case of horrendous crimes is, in fact, evidence of organic brain disorder. In every such case, that evidence must be given serious consideration. Under the present state of the law, given the relationship between the egregiousness of the offense and the gravity of the mental disorder, it is difficult to envision how we could ever be confident in advance that an objective sentencer would impose a death penalty notwithstanding that the defendant is suffering from an organic brain ailment.

\* \* \*

---

[6]At Leavitt's second sentencing hearing, the trial judge suggested that he was struggling to understand why Leavitt had committed the murder, stating that "[t]he fact that a[ ] generally law-abiding citizen, a father, husband, and so would do this act leaves one's [sic] asking why." Evidence of Leavitt's organic brain disorder would have made the commission of such a horrendous crime far more comprehensible to the judge.

In short, there can be little doubt that Parmenter's incompetent performance is "sufficient to undermine confidence in the outcome," and thus prejudiced Leavitt. *Strickland*, 466 U.S. at 694. It would not have been "insan[e]" for Parmenter to move the trial court for the MRI examination to which Leavitt was constitutionally entitled, and to cite the controlling Supreme Court authority of which the trial judge had not been advised the first time. *Contra* Maj. op. at 6488-89. To the contrary, making such a motion was an essential part of Parmenter's duty to provide effective assistance. His failure to seek, obtain, and introduce the evidence establishing that Leavitt suffered from organic brain damage necessarily undermines any reasonable jurist's confidence in the outcome of the sentencing proceeding. I regret that my colleagues, rather than reach the same conclusion, have decided to disregard the controlling law and the compelling facts of this case. Accordingly, I dissent.